654 So.2d 418 (1995)
Kathy C. HAYDEL, Individually and on Behalf of The Minor Children, Nikki Richard and Michelle Haydel
v.
HERCULES TRANSPORT, INC., Liquified Petroleum Gas Insurance Company, LPG Risk Retention Group, The Cropmate Company, and Conagra Fertilizer Company.
No. 94 CA 1246.
Court of Appeal of Louisiana, First Circuit.
April 7, 1995.
Writ Denied June 23, 1995.
*421 Carolyn A. McNabb, Houma, for plaintiff-appellant Kathy C. Haydel, Individually and on behalf of the Minor Children, Nikki Richard and Michelle Haydel.
Steven B. Rabalais, Lafayette, for defendant-appellee Hercules Transport, Inc.
Joseph Reilly, Houma, for defendant-appellee Tri-State Delta Chemicals, Inc. d/b/a Cropmate Co.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in an action for damages.

FACTS
On October 18, 1990, Ronald Day, an employee of Hercules Transport, Inc., was attempting to offload his tanker truck containing anhydrous ammonia at Cropmate Company, an anhydrous ammonia storage facility in Shriever, Louisiana. His attempt was unsuccessful, however, because the pump on the tank truck malfunctioned. Day contacted the dispatcher at Hercules who informed Day that a second truck was en route to the storage facility and that he should use the pump on the second truck to offload the chemical. When the second truck arrived, its driver offloaded her load of anhydrous ammonia. Day then connected a twenty-foot hose from his truck to the pump on the second truck. However, Day attached the hose to the discharge side of the pump, rather than to the suction side of the pump. Consequently, the chemical was not drawn into the pump and could not be pumped out of Day's truck. Because the anhydrous ammonia *422 was in a pressurized state, it was necessary for Day to remove the pressure within the line before he could disconnect the hose and reconnect it properly. After an unsuccessful attempt to bleed the line into a drum of water at the storage facility, Day decided to bleed the line by utilizing a special "bleeder valve" located on the tank truck, and approximately three gallons of anhydrous ammonia were vented into the air through the bleeder valve.
Shortly after this release, Kathy Haydel walked out of her house, which was located approximately four hundred feet from the storage facility, to put out the garbage. As she walked down the driveway, she noticed the smell of ammonia and then noticed a white cloud. Upon reentering her house, she evacuated her two daughters, Nikki and Michelle.
On March 19, 1991, Kathy Haydel, individually and on behalf of her minor daughters, Nikki Richard and Michelle Haydel, filed the instant action for damages.[1] Named as defendants in the action were: Hercules Transport, Inc. (Hercules) and its insurer, LPG Risk Retention Group Insurance Company (LPG); Tri-State Delta Chemicals, Inc. d/b/a Cropmate Company (Cropmate) and its insurer, Reliance Insurance Company (Reliance); and O'Neal Gas, Inc. (O'Neal).
Shortly before trial of this matter, the trial court granted a motion for summary judgment filed by Cropmate and dismissed plaintiffs' claims against it. Plaintiffs have appealed that judgment, which is the subject of a companion appeal entitled Haydel v. Hercules Transport, Inc., Liquified Petroleum Gas Insurance Company, LPG Risk & Retention Group, The Cropmate Company, and Conagra Fertilizer Company, 94-0016, (La. App. 1st Cir. 4/7/95); 654 So.2d 408.
The case proceeded to trial by jury on the merits against Hercules and LPG from September 20, 1993, to September 29, 1993. On October 29, 1993, the trial judge rendered judgment on the jury verdict, assessing Hercules with 90% of the fault and Kathy Haydel with 10% of the fault. Kathy Haydel was awarded $19,694.61 for past medical expenses, $2,400.00 for past lost wages, and $25,000.00 for past general damages.[2] Nikki Richard was awarded $2,500.00 for the loss of service, society, and support of her mother.[3] Michelle Haydel was awarded $5,000.00 for the loss of service, society, and support of her mother.[4] Punitive damages were not awarded.
From this judgment, plaintiffs appealed, assigning the following specifications of error:
1. Plaintiffs are entitled to explore in voir dire any prejudice that potential jurors may harbor regarding large damage verdicts, and it was error for the trial court to preclude plaintiffs from so questioning potential jurors.
2. Hercules' opening statement contained an admission of liability contrary to the pretrial order, and the trial court erred in denying plaintiffs a supplemental opening statement to inform the jury that Hercules was admitting liability for the first time at trial.
3. Hercules admitted liability in the opening statement, and the trial court erred in denying plaintiffs a directed verdict on the issue of liability.
4. Hercules was engaged in an ultrahazardous activity at the time of plaintiffs' injuries, and the trial court erred in denying plaintiffs a directed verdict of absolute liability on the part of Hercules.
5. Persons who use or handle inherently dangerous substances are held to an extraordinary degree of care, and the *423 trial court erred in refusing to so charge the jury.
6. Although Nikki Richard suffered no physical injury from the ammonia exposure, she was in the zone of danger, her fears were reasonable, and the jury erred in finding that Hercules' negligence did not cause her injury and in failing to award her damages for mental suffering.
7. There was uncontroverted testimony that Michelle Haydel suffered symptomology after the ammonia exposure that she did not suffer prior to the exposure, and the jury erred in finding that her condition was not caused by the ammonia exposure.
8. There was no testimony from which a reasonable person could conclude that Kathy Haydel purposely placed herself in a position of danger, and the jury erred in finding her 10% at fault for her injuries.
9. The jury erred in arbitrarily refusing to award Kathy Haydel any sum for future medical expenses.
10. The jury erred in awarding Kathy Haydel the sum of $2,400.00 for past loss of income despite uncontroverted testimony that prior to the exposure she was capable of earning $18,000.00 per year.
11. The jury erred in failing to make an award to Kathy Haydel for future loss of income or impairment of earning capacity.
12. The jury's award of $25,000.00 for past general damages was so woefully inadequate as to shock the conscience and was an error of law.
13. The jury erred in failing to make an award for future general damages considering uncontroverted testimony that she was still under treatment at the time of trial.
14. Considering the admission by Hercules that it purposely released a toxic chemical into the air without prior warning to nearby residents, and considering the admission by Hercules that it was unaware of the various propensities of the toxic chemical it transported, it was an error of law for the jury to refuse to make an award of punitive damages.
15. The trial court should exercise reasonable control over the mode and order of interrogating witnesses, and the trial court erred in failing to control repeated interruptions and comments upon the evidence by defense counsel.
16. The trial court erred in denying plaintiffs' motion for JNOV.
Hercules and LPG answered the appeal, assigning as error the trial court's denial of its peremptory exception pleading the objection of no cause of action and/or no right of action.

PREEMPTION
Hercules and LPG contend that the provisions of the Hazardous Materials Transportation Act (HMTA), 49 U.S.C. § 5101 et seq., and specifically 49 U.S.C. § 5125(b) and 49 U.S.C. § 5123, expressly preempt plaintiffs' state law cause of action for exemplary damages under LSA-C.C. art. 2315.3.
The preemption doctrine has its roots in the Supremacy Clause of the United States Constitution (Article VI, clause 2), which invalidates state laws that "interfere with, or are contrary to" federal law. See Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985); Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). Basic to this constitutional command is the notion that all state provisions which conflict with federal law are without effect. See Maryland v. Louisiana, 451 U.S. at 747, 101 S.Ct. at 2129, 68 L.Ed.2d 576.
Preemption may be either express or implied and is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Fidelity Federal Savings and Loan Association v. de la Cuesta, 458 U.S. 141, 152-53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); Jones v. Rath Packing Company, 430 U.S. 519, 525, 97 S.Ct. *424 1305, 1309, 51 L.Ed.2d 604 (1977); Massachusetts Medical Society v. Dukakis, 815 F.2d 790, 791 (1st Cir.1987), cert. denied, 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). Consideration under the Supremacy Clause begins with the basic assumption that Congress did not intend to displace state law. But, as the Supreme Court pointed out in Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947):
Such a purpose [to displace state law] may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose. Or the state policy may produce a result inconsistent with the objective of the federal statute. (citations omitted).
Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714. A state statute is also void to the extent it conflicts with federal lawif, for example, "compliance with both federal and state regulations is a physical impossibility," Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714; Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 1217-18, 10 L.Ed.2d 248 (1963), or where the law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hillsborough County, Florida v. Automated Medical Laboratories, Inc., 471 U.S. at 713, 105 S.Ct. at 2375, 85 L.Ed.2d 714; Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). See Maryland v. Louisiana, 451 U.S. at 747, 101 S.Ct. at 2129, 68 L.Ed.2d 576.
In the instant case, the specific Louisiana provision and federal statutes at issue are LSA-C.C. art. 2315.3 and 49 U.S.C. § 5125(b) and 49 U.S.C. § 5123, respectively.
LSA-C.C. art. 2315.3 provides as follows:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.
49 U.S.C. § 5125(b)(1) provides, in pertinent part, as follows:
Except as provided in subsection (c) of this section, a law, regulation, order, or other requirement of a State ... about any of the following subjects, that is not substantively the same as a provision of this chapter or a regulation prescribed under this chapter, is preempted:
* * * * * *
(B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.
49 U.S.C. § 5123 addresses a civil penalty for violation of any of the provisions of the HMTA and provides that "[a] person who knowingly violates this chapter or a regulation prescribed or order issued under this chapter is liable to the United States Government for a civil penalty of at least $250 but not more than $25,000 for each violation."
Hercules and LPG argue that plaintiffs' state law claims, under LSA-C.C. art. 2315.3, for exemplary damages arising out of "the storage, handling, or transportation of hazardous or toxic substances" are preempted by federal law in two ways. First, 49 U.S.C. § 5125(b) expressly preempts state laws dealing with the "handling ... of hazardous materials." The Louisiana state law provides for exemplary damages for the wanton or reckless disregard for public safety in the "storage, handling, or transportation of hazardous or toxic substances." Hercules and LPG reason that, because the Louisiana state law "is not substantively the same as" a provision in the federal law, it is expressly preempted. Second, 49 U.S.C. § 5125(a)(2) *425 expressly preempts a state requirement if that requirement "is an obstacle to accomplishing and carrying out this chapter or a regulation prescribed under this chapter."
We have carefully reviewed the HMTA, in its entirety, as well as the particular federal statutory provisions at issue, and conclude that LSA-C.C. art. 2315.3 is not preempted by the provisions of the HMTA.
The purpose of the HMTA is "to provide adequate protection against the risks to life and property inherent in the transportation of hazardous material in commerce by improving the regulatory and enforcement authority of the Secretary of Transportation." (emphasis added). 49 U.S.C. § 5101. Pursuant to this stated purpose, Congress enacted various laws and regulations, designating materials as hazardous, outlining rules for safe transportation, requiring registration, and standardizing forms, procedures, and policies. See 49 U.S.C. § 5101 et seq. 49 U.S.C. § 5125(b)(B) provides that a state law, regulation, order, or other requirement about "the packing, repacking, handling, labeling, marking, and placarding of hazardous material," which is substantively different from the federal provisions, is preempted. LSA-C.C. art. 2315.3 does not address the regulatory and enforcement authority of the Secretary of Transportation, nor does it seek to designate materials as hazardous or regulate the transportation, registration, or standardization of the handling of hazardous materials. If it did, to the extent that its provisions were substantively different from the federal provisions, the state provisions would be preempted.
However, LSA-C.C. art. 2315.3 merely sets forth a cause of action for exemplary damages in favor of an individual person who is injured due to a defendant's wanton or reckless disregard for public safety while engaged in the storage, handling, or transportation of hazardous materials, which are defined by federal law. Therefore, while the Louisiana state provision is substantively different from the federal provision, the federal and state statutes address totally separate and distinct subject matters.
Further, the federal penalty provision (49 U.S.C. § 5123) does not provide a remedy for individual persons injured as a result of the handling of hazardous materials; it authorizes the imposition of a fine to be paid to the federal government in the event that a person knowingly violates the HMTA. Conversely, the provisions of LSA-C.C. art. 2315.3 operate in favor of the individual damaged by the careless disregard in the handling of hazardous materials, but do not impose any sort of civil penalty in favor of any governmental body.
Moreover, LSA-C.C. art. 2315.3 does not stand as an obstacle to the accomplishment of any provision of 49 U.S.C. § 5101 et seq. A state cause of action for exemplary damages in favor of a person injured as a result of "the storage, handling, or transportation of hazardous or toxic substances" does not impede or make nugatory any of the various federal statutory provisions defining and regulating the transportation of hazardous materials. The purposes and objectives of the federal standards and penalty provisions are not thwarted by the availability of a state cause of action for exemplary damages. Nor does the state statutory provision conflict with federal law either expressly or impliedly.
Certainly, in enacting the HMTA, if Congress had intended to preempt the authority of states to enact laws recognizing a cause of action for the recovery of additional damages to persons injured by persons, who with wanton or reckless disregard for the safety of others, handle hazardous materials, Congress could easily have done so by including language to that effect. However, Congress did not include such a provision.
Accordingly, we find that the trial court was correct in denying the exception pleading the objection of no cause of action filed by Hercules and LPG.

VOIR DIRE
Plaintiffs contend that the trial court erred by precluding plaintiffs from questioning potential jurors about large damage verdicts.
LSA-C.C.P. art. 1763 addresses the examination of jurors, as follows:
A. The court shall examine prospective jurors as to their qualifications and may *426 conduct such further examination as it deems appropriate.
B. The court shall allow the parties to examine prospective jurors, but the court may control the scope of such examination.
The object and goal of the entire voir dire process is full voir dire with open-ended questions which lead to the exploration of each individual juror. Holmes v. Great Atlantic and Pacific Tea Company, 622 So.2d 748, 759 (La.App. 4th Cir.), writ denied, 629 So.2d 1178 (La.1993). In this regard, it is valid for counsel to determine whether a juror can act impartially or whether he should be disqualified because of some prejudice toward the litigants on the issues involved in the trial. Morgan v. Liberty Mutual Insurance Company, 323 So.2d 855, 859 (La.App. 4th Cir.1975).
The scope of the voir dire examination is within the sound discretion of the trial judge, and his rulings will not be disturbed on appeal in the absence of a clear abuse of that discretion. State v. Williams, 457 So.2d 610, 613 (La.1984); Mobley v. General Motors Corporation, 482 So.2d 1056, 1060 (La. App. 3rd Cir.), writ denied, 486 So.2d 735 (La.1986).
In the instant case, the record shows that, in questioning potential jurors, the following question asked by plaintiffs' counsel elicited an objection by defense counsel, which the trial court sustained:
[I]f you find that the trucking company in this case acted recklessly the law will allow you not only to compensate the plaintiffs for their injury, if you find that they were injured, but the law will also allow you to punish the trucking company. That law is with regard for punitive or exemplary damages it's called. It means you may punish them or make an example of them, if you find that they acted recklessly in this case. Ifif you would find in this case that the defendant was guilty of reckless conduct, that they were guilty of reckless disregard for the public safety, could you reach any verdict supported by the evidence even if that figure exceeded a million dollars? Anybody have any problems with that at the outset?
Plaintiffs argue that the purpose of the $1 million benchmark figure given was to determine whether the jurors could reach any verdict warranted by the evidence and to determine whether any limitations existed in the minds of the potential jurors with regard to the extent of exemplary damages. Plaintiffs contend that, because the judge sustained the objection, they were unable to uncover any prejudice of the jurors with regard to large damage verdicts.
The record indicates that, although the trial judge refused to permit plaintiffs' counsel to question potential jurors as to a specific dollar amount, the trial judge gave plaintiffs' counsel an opportunity to inquire into whether potential jurors could award substantial damage awards. Voir dire examination of potential jurors as to whether they could award a "substantial" verdict for exemplary damages would have uncovered any prejudice the jurors had with regard to this issue. The exact monetary limit to which the jury might be able to render a verdict is not critical to a determination of prejudice by the jury. Moreover, although the trial court afforded plaintiffs an opportunity to explore substantial damage awards on voir dire, it appears that counsel for plaintiffs did not vigorously pursue this issue after the trial judge refused to permit counsel to interject a specific dollar figure. A review of the voir dire transcript convinces us that the trial judge did not abuse his much discretion in sustaining the objection regarding examination as to a specific dollar value of a damage award.

ADMISSION OF LIABILITY
Plaintiffs contend that the defendants' opening statement contained an admission of liability and that the trial court erred in not allowing plaintiffs to make a supplemental opening statement to address the issue.
The regulation of opening statements is a matter which is within the sound discretion of the trial court. The rulings of the trial court in controlling and regulating the arguments of counsel will not be disturbed on appeal, unless they constitute an abuse of the trial court's much discretion. Starks v. Kelly, 435 So.2d 552, 554 (La.App. 1st Cir.1983). *427 See Knight v. First Guaranty Bank, 577 So.2d 263, 270-71 (La.App. 1st Cir.), writs denied, 581 So.2d 688, 690 (La.1991).
In the opening statement, defense counsel stated that the "truck drivers made mistakes" and that "Miss Haydel is entitled to compensation for the damages caused to her." Plaintiffs argue that these statements constitute an admission of liability by Hercules. The trial court, however, specifically found that defense counsel did not admit liability, but merely conceded that the misconnection of the hose was a mistake on the part of the defendants. The trial court then indicated that opening statements are not facts in evidence and that, throughout the trial, the primary issue was whether the defendants were liable for plaintiffs' alleged injuries.
After reviewing the entire record in this matter, we find that the trial court did not abuse its much discretion in denying plaintiffs the opportunity to present a supplemental opening statement to address defendants' alleged admission of liability, and this specification of error is without merit.

DIRECTED VERDICT
LSA-C.C.P. art. 1810 provides as follows:
A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for directed verdict that is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.
A trial judge has much discretion in determining whether to grant a motion for directed verdict. Barnes v. Thames, 578 So.2d 1155, 1162 (La.App. 1st Cir.), writs denied, 577 So.2d 1009 (La.1991). A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the mover's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. Adams v. Travelers Insurance Company, 589 So.2d 605, 608 (La.App. 2nd Cir.1991); Barnes v. Thames, 578 So.2d at 1162. However, if there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case should be submitted to the jury. Adams v. Travelers Insurance Company, 589 So.2d at 608.
On appeal, the standard of review for directed verdicts is whether, viewing the evidence submitted, the appellate court concludes that reasonable people could not reach a contrary verdict. Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 849 (La.App. 1st Cir.), writs denied, 605 So.2d 1117, 1119 (La.1992); Cliburn v. Colonial Penn Insurance Company, 583 So.2d 103, 105 (La.App. 3rd Cir.1991). It is axiomatic that the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. Adams v. Travelers Insurance Company, 589 So.2d at 608.

A. Absolute Liability.
Plaintiffs contend that the trial court erred in denying their motion for directed verdict as to defendants' absolute liability for engaging in an ultrahazardous activity at the time of plaintiffs' injuries.
Relying on Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982), plaintiffs argue that, because Hercules was in the process of transporting and handling a hazardous material, namely, anhydrous ammonia, defendants are absolutely liable to plaintiffs. In Kent v. Gulf States Utilities Company, 418 So.2d at 498, the Louisiana Supreme Court stated as follows:
There are some activities in which the risk may be altogether reasonable and still high enough that the party ought not undertake the activity without assuming the consequences. Such activities include pile driving, *428 storage of toxic gas, blasting with explosives, crop dusting with airplanes, and the like, in which the activity can cause injury to others, even when conducted with the greatest prudence and care.
For these particular activities, Louisiana courts have imposed absolute liability ..., which virtually makes the enterpriser an insurer. The enterpriser, whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving damage and causation.
In these cases of absolute liability (or liability without proof of negligence or other fault), liability is imposed as a matter of policy when harm results from the risks inherent in the nature of the activity. The steps taken by the enterpriser to protect others from the inherent risks of the activity are not relevant to the determination of liability. (citations omitted) (footnote omitted).
In the instant case, the trial court found that the handling and transportation of anhydrous ammonia is generally done quite safely. Thus, the court found that the defendants were not engaged in an ultrahazardous activity. The trial court indicated that anhydrous ammonia is used by local farmers on a daily basis (as fertilizer) and that the facts and circumstances of this case show that the handling and transportation of the chemical by the defendants was not, in and of itself, ultrahazardous.
Ronald Day, driver of the Hercules truck involved in the release of anhydrous ammonia on October 18, 1990, testified that he had been employed by Hercules for five and one-half years. On October 18, 1990, he transported a load of anhydrous ammonia to the Cropmate storage facility in Schriever, Louisiana. He attempted to offload the chemical from his tank truck into the storage tank, but a malfunctioning pump on his tank truck prevented him from offloading the ammonia. Approximately three hours later, Judy Duffell, another Hercules driver, arrived and offloaded her load of anhydrous ammonia successfully. Day then attempted to connect the hose from his tank truck to the pump on Duffell's tank truck in order to offload his tank.[5] However, Day testified that, once Duffell engaged the pump, he realized that he had misconnected the hose. Prior to disconnecting the hose and reconnecting it properly, it was necessary for Day to release the contents of the hose. After an unsuccessful attempt to release the contents into a water barrel at the Cropmate facility, Day decided to release the contents into the air through the bleeder valve located on the truck's tank. According to Day, there were approximately three gallons of anhydrous ammonia in the hose. He released a test cloud and watched it dissipate. Day then proceeded to release the remaining contents into the air through the bleeder valve, which was "cracked" open (approximately one-fourth of the way open). Following the release, Day disconnected the hose, properly reconnected it, and offloaded the load of anhydrous ammonia.
Day testified that it is standard procedure to bleed the hose contents into the air. According to Day, he previously had performed similar releases without incident.
Thomas M. O'Neal, president of Hercules, testified that anhydrous ammonia is a fertilizer used by local sugarcane farmers. Dr. Raymond Harbison, an expert pharmacologist and toxicologist, testified that anhydrous ammonia is not inherently dangerous. In fact, he stated that our bodies produce ammonia and that ammonia is contained in food. However, Dr. Harbison, acknowledged that ammonia can be toxic, depending on the concentration.
The transportation and offloading of anhydrous ammonia are not activities to which our courts have traditionally applied absolute liability. See Kent v. Gulf States Utilities Company, 418 So.2d 493, 498 (La.1982); Lawrence Davis v. Insurance Company of North America, et al., 94-0698, p. 5-6 (La. App. 1st Cir. 3/3/95); 652 So.2d 531.[6] These *429 activities, when conducted with the greatest prudence and care can be accomplished without injury to others. As the trial court found, the nature of the activity of transporting and offloading anhydrous ammonia does not contain inherent risks which result in harm to others in the absence of negligence or fault.
Based on the foregoing, the facts and inferences are not so overwhelmingly in favor of plaintiffs as to defendants' absolute liability that reasonable minds could not differ. Accordingly, the trial court correctly denied plaintiffs' motion for directed verdict as to the defendants' absolute liability.

B. Liability Generally.
Plaintiffs contend that the trial court erred in denying their motion for directed verdict as to defendants' liability.
After reviewing the record and the evidence submitted in the instant case, we conclude that the facts and inferences are not so overwhelmingly in favor of the plaintiffs with regard to defendants' liability that reasonable people could not reach a contrary verdict. Therefore, the trial court correctly denied plaintiffs' motion for directed verdict as to defendants' liability.

JURY INSTRUCTIONS
Plaintiffs contend that the trial court erred in refusing to instruct the jury that persons who use or handle inherently dangerous substances are held to an extraordinary degree of care.
In a jury trial, the judge is not required to give the instructions submitted by either party; however, he is obligated to give instructions which properly reflect the law applicable in light of the pleadings and facts in each case. Daigle v. Legendre, 619 So.2d 836, 839 (La.App. 1st Cir.), writ denied, 625 So.2d 1040 (La.1993). Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. Davidson v. Peden, 413 So.2d 568, 573 (La.App. 1st Cir. 1982).
The judge has a duty to charge the jury as to the law applicable in a case and a correlative responsibility to require that the jury get only the correct law. Sparacello v. Andrews, 501 So.2d 269, 277 (La.App. 1st Cir.1986), writ denied, 502 So.2d 103 (La. 1987). It is the judge's responsibility to reduce the possibility of confusing the jury, and he may exercise the right to decide what law is applicable. Sparacello v. Andrews, 501 So.2d at 277.
An appellate court must exercise great restraint before overturning a jury verdict on a suggestion that the jury instructions were so erroneous as to be prejudicial. Daigle v. Legendre, 619 So.2d at 839.
In the instant case, plaintiffs requested that the trial judge give the following jury instruction:
Persons who use or handle inherently dangerous agencies, substances, or instrumentalities, such as explosives, electricity, firearms, combustibles, and fireworks, which might endanger persons or property are held to a high or extraordinary degree of care.
The record reveals that the trial court instructed the jury, in part, as follows:
In this case one of the basic standards applicable is negligence. Negligence is not presumed. The mere fact that an accident happened, standing alone, does not permit you to draw the inference that the accident was caused by anyone's negligence. In this case the basic standard applicable is a requirement that the defendant exercise that degree of care which he might reasonably expect from an ordinarily prudent person under the same or similar circumstances. You will see that this is a very relative term. The care which we reasonably expect from an ordinarily prudent person will vary according to the circumstances *430 facing them. Notice also that the conduct we set up as a standard is not that of the extraordinarily cautious individual or the exceptionally skillful one but that of a person of ordinary prudence. While unusual caution or skill is to be admired and encouraged the law does not demand it as a standard of care in this case. The ordinarily prudent person will avoid creating an unreasonable risk of harm. In determining whether the defendant breached this standard and created an unreasonable risk of harm you may weigh the likelihood that someone might have been injured and the seriousness of that injury against the importance to society of what the defendant was doing and the advisability of the way in which he was doing it under the circumstances.
After giving the above general standard of care instruction, the trial judge went on to read various statutes specifically applicable to defendants' conduct.
After reviewing the jury instructions, as a whole, we conclude that the trial judge gave instructions which fairly and reasonably pointed up the issues presented by the pleadings and evidence and which provided correct principles of law for the jury's application thereto. Therefore, we find that the trial judge did not err in refusing to give plaintiffs' requested jury instruction.

COMPARATIVE NEGLIGENCE
Plaintiffs contend that the jury abused its discretion in assessing Kathy Haydel with 10% of the fault because there was no evidence from which reasonable persons could conclude that she purposefully placed herself in danger.
It is well settled that the allocation of comparative negligence is a factual matter within the sound discretion of the trial court, and such determination will not be disturbed on appeal in the absence of manifest error. Daigle v. Legendre, 619 So.2d at 840.
The Louisiana Supreme Court, in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985), set forth the guidelines for apportioning fault under the doctrine of comparative negligence. The court stated the following:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, the court listed various factors which may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d at 974.
In the instant case, Kathy Haydel testified that, on the evening of October 18, 1990, she walked out of her house to place the garbage by the street. Upon entering her screened-in porch, Kathy smelled ammonia, which she indicated was not unusual. When she walked outside, Kathy saw a whitish-gray cloud. The next thing Kathy recalls is being on the ground near her backyard fence. After recovering, Kathy pulled herself up and went into the house.
Applying the Watson analysis, we first note that, because it was not unusual for Kathy Haydel to smell ammonia outside of her home due to the nearby storage facility, her encounter with the anhydrous ammonia was due, in large part, to inadvertence.
As to the second factor, it is clear that, initially, a great risk was created by the Hercules employee's release of the anhydrous ammonia into the atmosphere. However, Kathy's failure to return to the house upon seeing the cloud approaching her, and then taking her two children out into the cloud, also created a great risk of harm to Kathy and her children.
The third factor is inapplicable here.
With regard to the fourth factor, i.e., whether either party had a superior capacity *431 to avoid the accident, it is clear that, initially, the Hercules employee had the superior capacity to avoid the accident by not releasing the anhydrous ammonia. But, once the anhydrous ammonia had been released, Kathy was in a superior position to avoid the accident by retreating into her house upon smelling and seeing the ammonia, rather than further exposing herself and her children to the ammonia. This is supported by the testimony of Dr. Raymond Harbison and Dr. Richard A. Parent.
The record indicates that Dr. Raymond Harbison, an expert pharmacologist and toxicologist, estimated that Kathy was exposed to an ammonia concentration of 200-300 parts per million. He testified that the "odor threshold" for ammonia is between five and fifty parts per million.[7] Dr. Harbison indicated that a person would be able to detect ammonia due to the odor and the irritant effect. According to Dr. Harbison, due to the "warning properties" of the substance, a person would most likely leave the area upon detecting the odor. Dr. Harbison explained that ammonia is a stimulant and not the type of chemical to cause unconsciousness.[8]
Dr. Richard A. Parent, a consulting toxicologist, estimated that Kathy was exposed to an ammonia concentration of 1,700 parts per million. He testified that the odor threshold for ammonia is between .04 and 56 parts per million. Dr. Parent explained that, although the fringes of an ammonia cloud are of lower concentrations than the interior, he would expect a person to be alerted to its presence before the cloud engulfs the person.
As to the final Watson factor, it seems that Kathy "proceeded in haste" because she panicked and feared for her life, as well as the lives of her children.
In light of our Watson analysis, we conclude that, although Kathy's fault was minimal relative to the fault of the Hercules employee is concerned, she was partially at fault for the injuries sustained. Based on the testimony in the record, the jury could have determined that, because Kathy smelled and saw the ammonia cloud prior to encountering it, she could have avoided the exposure by going inside her home and by not exposing her children to the cloud of ammonia. Because the record contains a reasonable basis for such a finding, we find no manifest error in the jury's allocation of 10% of the fault to Kathy Haydel.

NIKKI RICHARD'S DAMAGES
Plaintiffs contend that the jury abused its discretion in failing to award Nikki Richard damages for mental suffering. Plaintiffs concede, however, that Nikki suffered no physical injury from the ammonia exposure.
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the injured party in as near a fashion as possible to the state she was in at the time immediately preceding injury. McCray v. Abraham, 550 So.2d 244, 248 (La. App. 4th Cir.1989). The factors to be considered in assessing quantum for pain and suffering are severity and duration. White v. Longanecker, 93-1122, p. 4 (La.App. 1st Cir. 5/23/94), 637 So.2d 1213, 1215, writ denied, 94-1704 (La. 10/7/94); 644 So.2d 640.
Before a court of appeal can disturb a damage award made by a trial court, the record must clearly reveal that the trier of fact abused its much discretion in making the award. LSA-C.C. art. 2324.1; American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991). The initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Recently, *432 in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted that:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
In the instant case, with regard to Nikki Richard's alleged mental pain and suffering, the testimony and medical evidence reveal the following:
Nikki Richard testified that Kathy Haydel is her mother and that Michelle Haydel is her sister. Nikki indicated that, prior to the ammonia exposure, she was at home with her mother, sister, and her mother's friend, Debbie Bourgeois. According to Nikki, she smelled something in the house and saw "smog or smoke" coming into the house through the windows and doors. Once they all walked outside, there was a large cloud hovering over them. Nikki stated that she held her breath, closed her eyes, felt her way to the car, and left the premises.
Nikki testified that she was scared because she did not know what was happening, and she thought that they all might die. According to Nikki, she suffered no physical injuries from the ammonia exposure. Following the exposure incident, Nikki ran track during her senior year in high school, graduated in May, and received a four-year scholarship to Loyola University.
Deborah Bourgeois testified that there were no noticeable changes in Nikki after the exposure incident. Dr. Harold Ginzburg, psychiatrist, testified that he saw Nikki, but did not give her a diagnosis. However, he indicated that Nikki had no problems requiring therapy.
After carefully reviewing the entire record in this matter, we find that the jury acted within its much discretion in refusing to award Nikki Richard damages for mental pain and suffering.

MICHELLE HAYDEL'S DAMAGES
Plaintiffs contend that the jury erred in finding that Michelle Haydel's damages were not caused by the ammonia exposure.
A plaintiff bears the burden of proving the causal connection between an accident and injury (damage) by a preponderance of the evidence. Thomas v. Hartford Insurance Company, 540 So.2d 1068, 1074-75 (La.App. 1st Cir.), writ denied, 542 So.2d 516 (La.1989). A tort-feasor is only liable for damages caused by his negligent act; he is not liable for damages caused by separate, independent, or intervening causes. Thomas v. Hartford Insurance Company, 540 So.2d at 1075. However, a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). When a defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. Lasha v. Olin Corp., 625 So.2d at 1006. Before recovery can be granted for an aggravation of a pre-existing condition, a causative link between the accident and the victim's current status must be established. Causation is a question of fact, entitled to great weight, and the determination cannot be disturbed on appeal absent manifest error. Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir. 3/11/94), 633 So.2d 903, 909, writ denied, 94-0806 (La. 5/6/94); 637 So.2d 1056.
For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which *433 supports or controverts the finding of the trial court. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883.
With regard to Michelle's treatment, three pediatricians testified: Dr. Richard F. Lasseigne, Dr. Robert W. Clarke, Jr., and Dr. Robert C. Beckerman.
Dr. Richard F. Lasseigne testified that he saw Michelle on November 14, 1990, approximately three weeks following the ammonia exposure. His examination of Michelle revealed a slightly red throat, but the examination was otherwise normal. Dr. Lasseigne opined that Michelle had a viral pharyngitis (throat infection). According to Dr. Lasseigne, the infection was not likely to have been caused by the ammonia exposure.[9]
Dr. Robert W. Clarke, Jr. testified that he first saw Michelle on January 8, 1991, at which time she complained of shortness of breath. Dr. Clarke found that Michelle had a sinus infection and prescribed Proventil, which is a type of bronchodilator. Dr. Clarke diagnosed Michelle with asthma, bronchospasm, or reactive airways disease.[10] Dr. Clarke continued to treat Michelle and noted that, since May of 1992, she suffered from typical upper respiratory problems and sinus infections. Dr. Clarke testified that Michelle has mild asthma, which is well-controlled. Dr. Clarke stated that he could not opine whether Michelle's asthma-type symptoms are related to the ammonia exposure.
Dr. Robert C. Beckerman examined Michelle on March 4, 1992, and felt that she had reactive airways disease, which he explained is another name for asthma. According to Dr. Beckerman, it is not probable that Michelle's asthma was caused by the ammonia exposure. Dr. Beckerman indicated that, for the asthma symptoms to have been related to the ammonia exposure, Michelle would have had to experience lower respiratory symptoms within a week or two following the exposure. However, Dr. Beckerman stated that Michelle's asthma was not documented until several months after the exposure. According to Dr. Beckerman, Michelle had a history of eczema and other allergic manifestations which could have predisposed her to asthma.
After considering the testimony of Michelle's pediatricians, the jury concluded that the damages suffered by Michelle were not caused by the ammonia exposure. After reviewing the record in its entirety, we conclude that there is a reasonable factual basis for this finding and that such finding is not manifestly erroneous.

FUTURE MEDICAL EXPENSES
Plaintiffs contend that the jury abused its discretion in refusing to award Kathy Haydel any sum for future medical expenses.
An award for future medical expenses is in great measure highly speculative and is not susceptible of calculation with mathematical certainty. Gaspard v. Breaux, 413 So.2d 288, 292 (La.App. 3rd Cir.1982). However, like any other element of damage, future medical expenses must be established with some degree of certainty. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical *434 College, 522 So.2d 1144, 1149 (La.App. 2nd Cir.1988). An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost. Brumfield v. Guilmino, 633 So.2d at 908.
In the instant case, Dr. Jerome Michael Ellender, pulmonologist, testified that he first saw Kathy Haydel on October 22, 1990, at which time he diagnosed her with irritant tracheal bronchitis. Dr. Ellender subsequently diagnosed Kathy with reactive airways dysfunctional syndrome. Dr. Ellender testified that he last treated Kathy the week prior to trial and found that she appeared to be better than he had ever seen her. According to Dr. Ellender, Kathy's prognosis is good, and she will continue to improve.
Dr. Marsha Redden, clinical psychologist, testified that she began seeing Kathy on July 5, 1991, nine months after the ammonia exposure, and that she still was seeing Kathy on a weekly basis. Dr. Redden first diagnosed Kathy with post-traumatic stress disorder, then later with major depression. According to Dr. Redden, Kathy's condition had improved within the six months prior to trial. She noted that Kathy was more active and had improved psychologically. However, Dr. Redden indicated that she plans to continue treating Kathy with psychotherapy. Dr. Redden testified that Kathy's visits cost $90.00 each. However, she did not indicate the period of time for which she planned to continue treating Kathy.
A thorough review of the entire record convinces us that plaintiffs failed to prove Kathy's entitlement to future medical expenses with a reasonable degree of certainty. There is no indication that Dr. Ellender will continue to treat Kathy, nor is there an indication of the period of time for which Dr. Redden plans to continue treating Kathy. Further, the record does not set forth the probable cost of any alleged future medical expenses. For these reasons, we conclude that the jury did not abuse its much discretion in refusing to award Kathy Haydel future medical expenses.

PAST LOST WAGES
Plaintiffs contend that the jury abused its discretion in awarding Kathy Haydel only $2,400.00 in past lost wages.
In order to recover for actual wage loss, a plaintiff must prove that he would have been earning wages, but for the accident in question. See Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d at 1152. A claim for lost wages need not be proven with mathematical certainty; it only requires such proof as reasonably establishes the claim. This may consist of the plaintiff's own testimony. McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993); Woolfarth v. City of New Orleans, 572 So.2d 1194, 1196 (La.App. 4th Cir.1990). However, to allow a plaintiff to recover damages for lost wages when there is no independent support of plaintiff's claim is highly speculative. McDonough v. Royal Sonesta, Inc., 626 So.2d at 440; Hicks v. Barney, 526 So.2d 391, 392 (La.App. 4th Cir.1988).
In the instant case, Kathy Haydel testified that, on the date of the ammonia exposure (October 18, 1990), she was employed by the Terrebonne Parish Consolidated Government as a legal secretary for Judge Broussard. The approximate monthly salary for the position was $1,500.00. Kathy explained that the job was only temporary and that she began working there in late September of 1990. After the ammonia exposure, Kathy continued to work for Judge Broussard until his secretary returned on October 29, 1990, but she did not work full days.
According to Kathy, she subsequently rejected an offer by Billy Hebert of the Terrebonne Parish Consolidated Government for a full-time accounting position because of the problems allegedly caused by the ammonia exposure. Kathy has not worked since her temporary employment with Judge Broussard ended. However, Kathy did assist Judge Broussard with his political campaign through November of 1990.
Lawrence R. Robinson, personnel director for the Terrebonne Parish Consolidated Government, *435 testified that Kathy's temporary job with Judge Broussard ended on October 29, 1990, because the regular secretary returned. With regard to Kathy's contention that she rejected an offer for an accounting position with the parish government, Robinson indicated that no one, including Billy Hebert, could promise a public job to a person without that person first going through a competitive application process. According to Robinson, Kathy did not undergo such a process.
Dr. Jerome Michael Ellender, pulmonologist and Kathy's treating physician, testified that, from a pulmonary standpoint, Kathy would not have met any disability levels beyond the six to twelve month period following the exposure.
Dr. Douglas A. Swift testified that he saw Kathy on March 4, 1991, six months after the exposure. At that time, he felt that Kathy could return to work as a secretary/bookkeeper.
Dr. Marsha Redden, psychologist, testified that she first saw Kathy on July 5, 1991, and that she recommended "from the beginning" that Kathy get into a work routine, even if it was within the confines of her home.[11]
A review of the record reveals a lack of medical testimony on the issue of Kathy's medical disability. The record also lacks evidence of any job Kathy would have held after the temporary job with Judge Broussard ended.[12] Based on the record as a whole, we cannot say that the jury abused its much discretion in awarding Kathy $2,400.00 for past lost wages.

LOSS OF FUTURE INCOME/IMPAIRMENT OF EARNING CAPACITY
Plaintiffs contend that the jury abused its discretion in refusing to award Kathy Haydel damages for loss of future income or impairment of earning capacity.
In many instances, lost earning capacity and lost future earnings are different elements of damages. Earning capacity is not necessarily determined by actual loss; damages may be assessed for what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979). Such damages are calculated on the person's ability to earn money, rather on what he actually earned before the injury. Harris v. Pineset, 499 So.2d 499, 505-06 (La.App. 2nd Cir.1986), writs denied, 502 So.2d 114, 117 (La.1987); Hill v. Sills, 404 So.2d 1323, 1327 (La.App. 2nd Cir.1981).
Awards for lost future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. The courts must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and do not work a hardship upon either party. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d at 1152. Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life. Morgan v. Willis-Knighton Medical Center, 456 So.2d 650, 658-59 (La. App. 2nd Cir.1984).
In computing loss of future income, it is first necessary to determine whether and for how long a plaintiff's disability will prevent him from engaging in work of the same or similar kind that he was doing at the time of his injury. It is necessary also to ascertain whether he has been disabled from work for which he is fitted by training and *436 experience. Morgan v. Willis-Knighton Medical Center, 456 So.2d at 659.
In Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991), the Louisiana Supreme Court stated the following with regard to loss of future wages or loss of earning capacity:
To obtain an award for future loss of wages and/or loss of earning capacity, a plaintiff must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident. (Emphasis added).
In the instant case, the medical evidence in the record fails to indicate with "reasonable certainty" that Kathy Haydel suffers any residual disability which is causally related to the ammonia exposure. Dr. Ellender testified that, from a pulmonary standpoint, Kathy would not have met any disability levels beyond the six to twelve month period following the exposure incident. Dr. Hans Weil, pulmonologist, testified that any health effects Kathy sustained as a result of the exposure were very short-term. Dr. Weil opined that, from a pulmonary standpoint, Kathy was not disabled and was capable of working. Dr. Swift also testified that Kathy was not disabled and was capable of working at least since March 4, 1991. Dr. Susan Andrews, psychologist, testified that Kathy was not disabled from a psychological standpoint and that her condition should improve after the litigation ends.
Jennifer Palmer, a vocational rehabilitation specialist, testified that Kathy has the capacity to return to work either within or outside her home. According to Palmer, Kathy has the ability to earn what she was earning prior to the exposure; thus, she has suffered no loss of earning capacity.
Even plaintiff's own expert economist, Dr. Randolph Rice, acknowledged that, if Kathy is able to return to work as suggested by the medical evidence, her future wage loss would be zero.
Based on the foregoing testimony, we cannot say that the jury abused its much discretion in refusing to award Kathy Haydel damages for future lost wages and/or loss of earning capacity.

KATHY HAYDEL'S GENERAL DAMAGES
Plaintiffs contend that the jury abused its discretion in awarding Kathy Haydel only $25,000.00 for past general damages and in refusing to award her future general damages.
The medical evidence and the testimony in the record reveal that Dr. Ellender began treating Kathy on October 22, 1990. Dr. Ellender diagnosed Kathy's conditions as irritant tracheal bronchitis. He continued to treat Kathy and subsequently diagnosed her with reactive airways dysfunctional syndrome, which is a reaction of the airways to certain stimuli and causes constriction of the airways and symptoms such as coughing, wheezing, and chest tightness. Dr. Ellender also felt that Kathy might be suffering from asthma, a condition which exhibits symptoms similar to irritant tracheal bronchitis and reactive airways dysfunctional syndrome. According to Dr. Ellender, Kathy's main complaint was coughing caused by various things, such as cigarette smoke, perfume, and gas and diesel fumes. Dr. Ellender prescribed medication for the treatment of Kathy's stress and anxiety and later prescribed an anti-depressant. According to Dr. Ellender, Kathy probably had some psychosomatic complaints during the first year following the exposure, but, after that, her symptoms were all psychological. Dr. Ellender testified that Kathy has improved over the year and one-half preceding the trial and that she should continue to improve.
Dr. Douglas A. Swift, an expert in occupational and environmental medicine, testified that he saw Kathy on March 4, 1991, six months after the exposure. He opined that Kathy does not have reactive airways dysfunctional syndrome. His examination revealed inflammation in her nasal lining, specifically in the turbinates, which he stated is often caused by seasonal allergies. Dr. Swift opined that Kathy could have returned to work at that time and that he did not expect her to have chronic problems from the exposure.
*437 Dr. Marsha Redden, psychologist, began seeing Kathy on July 5, 1991, and continued seeing her on a weekly basis. Dr. Redden indicated that Kathy was very angry, felt caged, and was having nightmares. Dr. Redden first diagnosed Kathy with post-traumatic stress disorder and subsequently diagnosed her with major depression. According to Dr. Redden, Kathy's condition had improved over the six months preceding the trial.
Dr. Hans Weil, pulmonologist, testified that he examined Kathy on February 19, 1992, and found no effects from the exposure. He opined that Kathy does not suffer from reactive airways dysfunctional syndrome and that she was not disabled.
Dr. Susan Andrews, psychologist, evaluated Kathy on March 5, 1993, and opined that she suffered from an anxiety disorder, but felt that Kathy suffered from this condition prior to the exposure. Dr. Andrews indicated that the exposure was just one factor causing Kathy's anxiety. According to Dr. Andrews, Kathy has a good prognosis for recovery from her anxiety condition.
Dr. Kaye Kilburn, toxicologist and pulmonologist, testified that he first saw Kathy on March 23, 1993, at which time Kathy complained of coughing triggered by certain odors. Dr. Kilburn diagnosed Kathy with an airway disease, which is a hyper-reactive, twitchy, asthmatic airway, as well as a mood disorder. According to Dr. Kilburn, Kathy has a good prognosis, but she needs to avoid things which trigger her sensitivity.
Dr. Harold Ginzburg, neuropsychiatrist, testified that he first examined Kathy on July 9, 1993. Dr. Ginzburg felt that Kathy had psychological factors affecting her physical condition, as well as post-traumatic stress disorder and adjustment disorder with depressed mood. According to Dr. Ginzburg, Kathy will require psychotherapy to assist her in adapting to a lifestyle with restrictions. He indicated that Kathy would benefit, both practically and psychologically, from returning to work.
Dr. John E. Salvaggio, an internist with a subspecialty in allergy and immunology, examined Kathy in July or August of 1993. Dr. Salvaggio witnessed one of Kathy's coughing attacks and opined that she had a reaction, which was "non-physical" or "non-medical." He explained that people with anxiety problems often experience such hysterical reactions. Dr. Salvaggio concluded that his findings (elevated blood pressure and boggy turbinates)[13] were not caused by the exposure.
Dr. Michael R. Robichaux, an ear, nose, throat, and allergy specialist, testified that he had seen Kathy approximately once a year from June 3, 1977, to January 30, 1991, for inhalant allergies, allergic rhinitis, and other allergic-type respiratory symptoms.
Kathy Haydel testified that, at the time of the exposure, she had a suffocating feeling and was afraid she and her children were all going to die. After the exposure, Kathy experienced coughing, shortness of breath, burning sensations, and stomach problems. According to Kathy, she moved out of her home after the exposure; she was unable to sleep in the house because of her fear that she would be exposed to ammonia again. Kathy indicated that, after the exposure, she was no longer able to do the things she had once done, had no social life, and embarrassed her daughters and that her relationship with her daughters changed.
On cross-examination, Kathy acknowledged that, around the time of the exposure, she was "stressed" by several things, including her mother's death, her divorce, the responsibility of raising her children alone, and the failure to find employment to replace the temporary job with Judge Broussard.
Kathy's daughters, Michelle and Nikki, testified that, after the exposure, their mother was not the same. They no longer went to movies or to the mall together and no longer shared picnics. Both girls stated that their mother's coughing attacks embarrassed them.
Kathy's boyfriend, F. Charles Fanguy, Jr., testified that, following the ammonia exposure, Kathy's attacks prevented them from going out dancing or going to dinner or movies.
*438 After carefully reviewing the entire record in this matter, we find that the jury's award of $25,000.00 for past general damages and its refusal to award future general damages were well within its much discretion. See Youn v. Maritime Overseas Corp., 623 So.2d at 1261. Therefore, these awards will not be disturbed on appeal.

EXEMPLARY DAMAGES
Plaintiffs contend that the jury erred in failing to award exemplary damages pursuant to LSA-C.C. art. 2315.3.
LSA-C.C. art. 2315.3 provides, in pertinent part, as follows:
In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances.
In Cates v. Beauregard Electric Cooperative, Inc., 316 So.2d 907, 916 (La.App. 3rd Cir.1975), affirmed, 328 So.2d 367 (La.1976), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), the court gave meaning to the terms "wanton" and "reckless" as follows:
The terms "willful", "wanton", and "reckless" have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do [sic] the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by conscious indifference to consequences, amounting almost to a willingness that harm should follow.
Thus, plaintiffs must have shown that Hercules' misconduct was committed with the state of mind that Hercules knew that the public safety was at risk or should have known that it was highly probable that harm to the public would result from its acts or omissions.
The record indicates that Ronald Day, the driver of the Hercules truck involved in the anhydrous ammonia release, did not release the chemical with the state of mind that he knew the public safety was at risk or that he should have known that it was highly probable that harm to the public would result from his acts.
Day testified that he had been employed by Hercules for five and one-half years, transporting hazardous materials. According to Day, when there is a large spill of a hazardous material, he is required to notify the fire department or police department. However, he explained that, in this instance, there were only three to four gallons of anhydrous ammonia contained in the hose. In Day's estimation, he was a safe distance from any residences, the closest one being about a "football field or more" away. (In fact, Dr. James Moser testified that he measured the distance from the point of release to the plaintiffs' residence to be approximately 400 feet). Day testified that he had, on previous occasions, used the bleeder valve to release a chemical from the hose, with houses and barns located about a football field away or closer, without incident.
Day indicated that he took into consideration the safety of nearby residents prior to releasing the contents of the hose. According to Day, he first let out a test cloud of the anhydrous ammonia and watched to determine the direction of the wind. Day stated that the chemical dissipated, so he slowly released the remaining contents. Judy Duffell, driver of the other Hercules truck, testified that she watched the chemical released by Day dissipate into the air, noting that the wind helped it to dissipate more quickly.
Day testified that he slowly released the chemical from the valve, which he "cracked" "not even a quarter of the way open." The release took between one and two minutes. Dr. Moser opined that it would have taken Day only ten seconds to release the chemical if he had opened the valve fully.
*439 The foregoing testimony reveals that Day did not act with a "conscious indifference to consequences, amounting almost to a willingness that harm should follow." Therefore, we conclude that the jury was not manifestly erroneous in failing to find that Hercules was guilty of wanton or reckless disregard for public safety and in failing to award exemplary damages.

JUDGMENT NOTWITHSTANDING THE VERDICT
Plaintiffs contend that the trial court erred in denying its motion for judgment notwithstanding the verdict (JNOV).[14]
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of the evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott v. Hospital Service District No. 1 of Parish of St. Charles, 496 So.2d 270, 273-74 (La.1986). In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991).
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. In making this decision, the appellate court uses the same criteria as did the trial judge in granting the motion. Anderson v. New Orleans Public Service, Inc., 583 So.2d at 832; Drury v. American Honda Motor Company, Inc., 93-1414 (La.App. 1st Cir. 12/22/94); ___ So.2d ___ [1994 WL 739162]. This is done by determining whether the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion, and the jury verdict should be reinstated. Anderson v. New Orleans Public Service, Inc., 583 So.2d at 832.
Using the criteria set forth above, we find that the trial judge correctly denied the plaintiffs' motion for JNOV. The facts and inferences do not point so strongly and overwhelmingly in favor of the plaintiffs that reasonable men could not reach a contrary verdict.

CONDUCT OF DEFENSE COUNSEL
Plaintiffs contend that the trial court failed to control repeated interruptions by defense counsel, which involved his inability to hear questions by plaintiffs' counsel or responses by the witnesses, and certain alleged comments upon the evidence by defense counsel.
LSA-C.C.P. art. 1631(A) addresses the court's power over the proceedings and provides as follows:
The court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done.
After reviewing the transcript in its entirety, we conclude that the trial court properly controlled the proceedings below. The trial court demanded that the proceedings be conducted with "dignity and in an orderly and expeditious manner." Therefore, the assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed at plaintiffs' cost.
AFFIRMED.
SHORTESS, J., concurs in part and dissents in part with reasons.
*440 SHORTESS, Judge, dissenting in part.
I disagree with that portion of the majority opinion which casts plaintiff with 10% of the fault. My analysis of the Watson factors convinced me that plaintiff was guilty of no contributory fault. In particular, plaintiff has been chastised for "proceeding in haste." I believe that requirement refers more to acting rashly rather than moving quickly to get out of the way of anhydrous ammonia, which I consider to be an ultra-hazardous chemical, subjecting a negligent user to possible punitive damages.
I respectfully dissent in part.
NOTES
[1] Nikki Richard became a major during the pendency of the proceedings and claimed damages, in her own right, for the loss of support, society, and services of her mother.
[2] Kathy Haydel was not awarded damages for future medical expenses, future lost wages and/or earning capacity, or future general damages.
[3] Nikki Richard was not awarded past general damages for her own injuries.
[4] Michelle Haydel was not awarded damages for past medical expenses, future medical expenses, past general damages, or future general damages for her own injuries.
[5] Day had contacted the dispatcher at the Hercules plant and was told to wait for Duffell and to use her pump to offload his truck.
[6] See also Craig v. Montelepre Realty Company, 252 La. 502, 211 So.2d 627 (1968) and D'Albora v. Tulane University, 274 So.2d 825 (La.App. 4th Cir.), writs denied, 278 So.2d 504, 505 (La.1973) (pile driving); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971) (escaping gas used in manufacture of petrochemical products); Gotreaux v. Gary, 232 La. 373, 94 So.2d 293 (1957) (crop dusting by airplanes); Fontenot v. Magnolia Petroleum Company, 227 La. 866, 80 So.2d 845 (1955) (blasting with explosives).
[7] Odor threshold is the concentration at which one can perceive the odor of a given substance.
[8] Also, Dr. Harbison stated that, for there to have been unconsciousness, there would have been severe lung tissue damage, of which there was no indication in Kathy.
[9] Dr. Lasseigne's notes indicate that Michelle had previously suffered allergies to dust and feathers and that allergies existed on both sides of Michelle's family.
[10] According to Dr. Clarke, these terms are interchangeable.
[11] Kathy had previously worked out of her home doing bookkeeping.
[12] Although Kathy testified that, in August of 1993 (one month prior to trial), she placed an advertisement for accounting work out of her home, the only evidence of record with regard to the acceptance of employment is Kathy's testimony that she received a telephone call regarding doing sales tax forms for a small business for $25.00 per month.
[13] Dr. Salvaggio explained that turbinates are mucosal tissues which line the nose and sinuses.
[14] Plaintiffs filed a Motion for JNOV, Alternatively New Trial. However, on appeal, they assigned as error only the denial of the motion for JNOV.