JjjFITZSIMMONS, 3.
On August 6, 1994, Mr. Kenneth Clark and his step-father, Mr. Jack Ray Wing-field, both commercial track drivers, were hauling a load of cattle from Florida to Arizona via Interstate Highway 10, westbound. A fatal accident occurred when the driver of the double decked tractor-trailer, Mr. Clark, entered a sharply curving ramp on the interstate, just before the Mississippi River Bridge in Baton Rouge, Louisiana. At the time of the accident, approximately 5:50 a.m., Mr. Wingfield was asleep in the sleeper compartment of the tractor cab.
The tractor-trailer rolled over the ramp railing and landed on the highway below. *793 Mr. Wingfield subsequently died of the massive injuries he sustained. Mr. Clark also suffered serious injuries, including an injury to his brain that left him totally disabled and unable to care for himself.
Mr. Wingfield’s wife, individually and as guardian for her son, Mr. Clark, filed suit on June 22, 1995. Mrs. Wingfield alleged that defendants, State of Louisiana, through the Department of Transportation and Development (DOTD), and its insurer, National Union Fire Insurance Co.,[2] were liable for all the damages sustained. She alleged that the DOTD knew that the interstate, at the site of the accident, was unreasonably dangerous because of defective design and inadequate warning signs. On July 21, 1995, plaintiffs, Jackie Murray, Sharon Ray Rovner, Ivy J. Wills as guardian for Joseph Edward Wingfield, and Joseph Edward Wingfield, filed a separate petition for damages based on essentially the same allegations. Jackie, Sharon, and Joseph are children of the deceased Mr. Jack Wingfield. Their mother, Ivy Wills, is the former spouse of the decedent. The two suits were consolidated.
1 ¿After a jury trial, the jury found defendants, DOTD and its insurer, liable and attributed to them 54% of the fault. Mr. Clark, the driver, was found to be 46% at fault. The jury awarded damages totaling almost fourteen million dollars. A judgment implementing the jury’s verdict was signed on May 25, 2001. The judgment assessed 66 percent of the taxable costs to defendants, and also imposed on DOTD 100% of the fault for the survival and wrongful death actions arising from Jack Wingfield’s injuries and death.
Subsequently, plaintiffs filed a rule to tax costs, a post-trial motion for a new trial, and, in the alternative, a motion to have repealed Louisiana Revised Statutes 13:5114 declared unconstitutional. Defendants filed a motion for judgment notwithstanding the verdict (JNOV), and in the alternative, a motion for new trial. By judgment dated August 3, 2001, the various motions were decided, and the May 2001 judgment was amended where necessary and adopted. The trial court granted the JNOV, and reduced the Wingfield survival action award from $800,000.00 to $500,000.00. The trial court excluded from a reversionary trust, previously ordered by the trial court, the jury’s award of future economic losses, but affirmed the inclusion in the trust of Mr. Clark’s award for future medical expenses. The rule to tax costs, which asked for the trial court to give a specific amount of the plaintiffs’ expenses to be paid by defendants, was taken under advisement, but is not at issue here. All other motions were denied.
Defendants appealed. Plaintiffs answered the appeal.

FEDERAL PREEMPTION

Before trial, defendants filed a motion for summary judgment on the issue of federal preemption of Louisiana tort law. Defendants alleged that the highway in question had been designed, built, and signed as a joint state and federal project, but with the mandated approval of the federal government and with 90 percent of the funding provided by the federal government. Based on their claim of | Kpreemption, defendants argued that plaintiffs could not seek damages based on alleged defects in a highway designed, constructed, and signed under federal requirements. The thrust of the argument seems to be that federal approval equates to the *794 absence of any negligence or liability for the state. Initially, plaintiffs pointed out that the applicable federal law, the Federal Aid Highway Act (FAHA), 23 U.S.C. § 101, et seq., did not contain any express preemption clause. They also argued that federal funds are linked to the state’s compliance with the FAHA, but the FAHA does not provide any remedy to a victim of negligence. Finally, plaintiffs asserted that Louisiana tort law does not conflict with or frustrate the purpose or goal of the FAHA. Thus, the federal standards and rules are not meant to preempt by implication or by operation all of Louisiana tort law. After a hearing, the trial court denied the motion. Defendants assigned error to that ruling.
Federal preemption of an area of law may be either express or implied. Haydel v. Hercules Transport, Inc., 94-1246, p. 6 (La.App. 1 Cir. 4/7/95), 654 So.2d 418, 423, units denied, 95-1172 (La.6/23/95), 656 So.2d 1019. Particularly in an area of law traditionally occupied by the state, the party claiming preemption must show an express preemptive clause in the federal law. Alternatively, the party must overcome an assumption of state sovereignty and prove “a clear and manifest purpose” by Congress to supersede state law. Rice v. Santa Fe Elevator Corporation, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); see Haydel, 94-1246 at p. 6, 654 So.2d at 424. In a similar vein, the court may find preemption when “compliance with both federal and state regulations is a physical impossibility,” or when the state law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress ....” Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 141-43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); Haydel, 94-1246 at pp. 6-7, 654 So.2d at 424. If Congress’s intention [ fiis ambiguous, there is a general presumption against preemption. See Florida Lime & Avocado Growers, Inc., 373 U.S. at 146-47, 83 S.Ct. at 1219.
Defendants reference no express preemption clause in the FAHA. Compare Duncan v. Kansas City Southern Railway Co., 2000-0066, p. 7 (La.10/30/00), 773 So.2d 670, 678, cert. denied, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001) (The federal act contained an express preemption provision.). On the contrary, the FAHA contains the following: “appropriation of Federal funds ... under this chapter shall in no way infringe on the sovereign rights of the States to determine which projects shall be federally financed. The provisions of this chapter provide for a federally assisted State program.” 23 U.S.C. § 145(a) (Emphasis added.).
Tort law falls within the traditional power of this state to protect its citizens. Louisiana tort law is designed to place the burden of repair on those that caused the damage or on those persons who had custody of damage-causing property. La. C.C. art. 2315 & 2317. The object of the FAHA is to promote, through federal funding, the construction of federal aid highways. See 23 U.S.C. § 101, et seq.; State of Vermont v. Goldschmidt, 638 F.2d 482, 483 (2nd Cir.1980). The FAHA does provide standards, but the issue here is not whether the highway met the minimum standards necessary for federal funding. See 23 U.S.C. § 109 (standards). The issue is whether the highway was an unreasonably dangerous one; defective by inadequate warnings and in design. The FAHA standards do not attempt to supersede the prohibition in our state law against negligent acts of design, construction, or signage or imposition of strict liability. Nothing in the FAHA provided an *795 alternative to our tort law or required the state to build an unreasonably dangerous and defective highway. Thus, based on our thorough review of the record, we see no error in the trial court’s denial of the summary judgment on the issue of preemption. The defendants failed to prove a manifest 17intention by Congress to replace Louisiana tort law with the FAHA, or prove that our tort law stands as an obstacle to the federal standards of design, construction, or signage.

VALIDITY OF MEXICAN MARRIAGE

Defendants assigned error to the trial court’s denial of their peremptory exception raising the objection of no right of action against the claims asserted by Mrs. Gordean Wingfield, the alleged spouse of the deceased, Mr. Jack Wingfield. Defendants asserted that the Wingfield marriage was not valid; thus, she was not the right party to assert the survival and wrongful death actions. See La. C.C. arts. 2316.1A(1) & 2315.2A(1).
Louisiana recognizes marriages that are valid under the law of the state (1) where contracted or (2) where the spouses were first domiciled. La. C.C. art. 3520. After a thorough review of Mrs. Wing-field’s testimony concerning her marriage, her documentary evidence, and applicable California law (first marital domicile), we cannot say that the trial court erred in denying DOTD’s exception of no right of action. See Freeman S.S. Co. v. Pillsbury, 172 F.2d 321, 323-24 (9th Cir.1949); McMurren v. McMurren, 143 Cal.App.2d 804, 299 P.2d 888 (1956).

EVIDENCE OF MARIJUANA USE

During the proceedings below, plaintiffs filed a motion to exclude the expert testimony of defendants’ experts on the issue of the alleged use of marijuana by the driver of the truck, Mr. Clark, and filed a motion for partial summary judgment on DOTD’s “Affirmative Defense of Comparative Negligence for Driving Under the Influence of Marijuana.”[3] On December 21, 2000, a hearing was held to resolve various issues raised concerning the admissibility of the marijuana evidence and | Splaintiffs’ motion for summary judgment. At the hearing, exhibits and testimony were presented.
At the end of the December hearing, the trial judge candidly admitted that the disagreements among the experts on the issue of use and impairment, and its effect on driving, should be resolved by the jury. Additionally, the trial judge noted that most relevant evidence was prejudicial to one side or the other, but that generally the evidence on the impairment issue should go to the jury. However, the judge then made several credibility determinations concerning the various opinions of the experts. Based on the credibility determinations, the judge found that there was not sufficient evidence to arrive at the conclusion of impairment at the time of the accident. These factual findings and the court’s conclusion served as the basis for the trial judge’s grant of the motion to exclude defendants’ experts’ testimony regarding marijuana and grant of the partial summary judgment dismissing the defendants’ affirmative defense of Mr. Clark’s negligence in driving under the influence of marijuana. The excluded evidence from both sides was proffered.
On appeal, defendants assigned error to the exclusion of the evidence of the alleged marijuana use. They argue that the exclusion of the evidence tainted the jury verdict and requires a de novo review.
*796 To be admissible, evidence must-be relevant and not unduly prejudicial. La. C.E. arts. 104 & 401-403. “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.” La. C.E. art. 702. Additionally, our supreme court has adopted federal jurisprudential guidelines, provided in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to aid in interpreting article 702 and ^ensure that scientific and technical expert testimony meets minimal standards of reliability and relevance. See State v. Foret, 628 So.2d 1116, 1123 (La.1993).
The Daubert/Foret guidelines require that expert opinions be grounded in approved methods and procedures of science, rather than just subjective belief or unsupported speculation. The trial court must also ensure that the scientific “evidence admitted is not only relevant, but reliable.” Daubert, 509 U.S. at 589, 113 S.Ct at 2795; see La. C.E. 104 & 401-403. Before the expert opinion can be admitted, the trial court must make “a preliminary assessment” that “the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.” Daubert, 509 U.S. at 592-93, 113 S.Ct. at 2796; Vardaman v. Baker Center, Inc., 96-2611, p. 6 n. 6 (La.App. 1 Cir. 3/13/98), 711 So.2d 727, 731 n. 6. The court must also determine whether the “probative value” of the expert testimony or opinion would be “substantially outweighed by the danger of’ confusion or an undue prejudicial effect on the fact finder. La. C.E. art. 403; see Foret, 628 So.2d at 1127; Fussell v. Roadrunner Towing and Recovery, Inc., 99-0194, p. 3 (La.App. 1 Cir. 3/31/00), 765 So.2d 373, 376, writ denied, 2000-1264 (La.6/23/00), 765 So.2d 1042; State v. Brooks, 98-1151, p. 19 (La.App. 1 Cir. 4/15/99), 734 So.2d 1232, 1242, writ denied, 99-1462 (La.11/12/99), 749 So.2d 651. To fulfill the trial court’s gatekeeper function for proposed expert evidence, various factors may be considered by the trial judge: (1) whether the technique has been subjected to peer review or publication, (2) the “known or potential rate of error,” (3) a “reliability assessment,” in which the “degree of acceptance” within a scientific community may be determined and reviewed, and (4) the “testability” of the technique. Daubert, 509 U.S. at 593-94, 113 S.Ct. at 2796-2797. However, the approach is a flexible one, and the list of factors is neither exclusive nor mandatory. Daubert, 509 U.S. at 593-95, 113 S.Ct. at 2796-2797. The admission |inof evidence, expert or otherwise, is subject to the trial court’s discretion. Fussell, 99-0194 at p. 3, 765 So.2d at 375; see State v. Catanese, 368 So.2d 975, 983 (La.1979).
After a review using the Daubert/Foret guidelines, and considering relevancy and possible prejudice, we agree with the judge’s initial remarks that the majority of the evidence should have been presented to the jury. A legal error occurred when the trial judge based his ruling not on the evidentiary articles and jurisprudence governing admissibility, but on his own credibility decisions and choice of expert opinions. The legal error of the use of the wrong standard led to an abuse of the trial court’s discretion in admissibility rulings.
Although the mere mention of marijuana may carry some prejudice, the presence of a controlled substance in a driver’s system may certainly be relevant “as long as it could be reliably determined” that the *797 driver used the drug within a period of time that could probably “impair one’s ability to drive.” Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Company, 161 F.3d 77, 88 (1st Cir.1998). With the presentation of evidence from both sides, the possibility of baseless prejudice engendered by a general bias against marijuana smokers would be addressed. The specific scientific knowledge imparted by the experts would be more probative than prejudicial. See La. C.E. art. 403.
The tests available to determine levels of marijuana in one’s system and its effects on driving are far from settled areas of science. It was not defendants’ burden to present evidence with an absolute degree of certainty, and not the trial judge’s function to determine which theory was the best supported. See Ruiz-Troche, 161 F.3d at 85. The Daubert/Foret guidelines require “only that the proponent of the evidence show that the expert’s conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.” Id.
I^In this case, defendants’ experts offered evidence of three different immunoassay or Emit tests and a separate gas chromatography and mass spectrometry (GC/MS) test. All of these tests showed that the driver’s urine was positive for marijuana. Although a certain procedure for confirmation is preferred, the same positive result from the Emit tests and the GC/MS test could have been reasonably viewed as a confirmation of the positive finding, which provided the necessary reliability for admission. For the next step in their analysis, defendants’ experts used the findings from the Emit tests as proof that the driver’s urine had a level at, or greater than, 100 nanograms per milliliter of carboxy THC (metabolite of marijuana). While formulating his opinion, a defense expert consulted the lab that reported the level at, or greater than, 100 nanograms about a possible ambiguity in the testing procedures. The lab answered the concerns and affirmed the result. From eyewitness testimony of the driver’s past use, the driver could be reasonably classified as an occasional user of marijuana. With that classification and reported test level, and drawing from accepted, published studies, the defendants’ experts concluded that, on average, marijuana use would have occurred within 24 hours. After consulting published studies showing that cognitive skills could be affected by marijuana use within 24 hours, defendants’ experts then analogized driving decisions to some of the studied cognitive skills. Defendants also pointed to a study showing how flight skills were affected by marijuana use, and analogized flight skills to driving skills. Finally, considering alleged facts related to the accident, such as speeding, failure to brake, or failure to slow properly, defendants’ experts opined that impairment of the driver from marijuana use was probable and could have contributed to the cause of the accident.
Plaintiffs’ experts testified that blood tests were more reliable for quantifying the actual level of marijuana in a human’s system and judging impairment. In the opinion of plaintiffs’ experts, impairment could not be inferred or found from a lamine test alone. Additionally, plaintiffs attacked the procedures employed by the various labs reporting the Emit and GC/MS test results, the limitations of urine testing, the defendants’ interpretation of reported scientific studies, and the conclusions drawn from the test results and the experts’ analyses. As an example of the limitations of urine tests, any attempted quantification should be adjusted to account for variations in the strength of marijuana, the user’s history of usage, and height and weight of the user. These attacks may have rebutted and even overwhelmed defendants’ allegations of actual *798 impairment, but did not establish that all of the opinions of defendants’ experts were based on unacceptable scientific studies, or establish that the majority of their opinions were scientifically unreliable. Additionally, isolated testimony may have inferred that defendants’ experts concluded impairment based only on the urine levels. However, a consideration of all of the testimony showed that other factors were relied on as well. In fact, one of the plaintiffs’ experts used an essentially similar analytical process to determine impairment. Though one of plaintiffs’ experts preferred to use allegedly more reliable blood tests, she deduced impairment from test results and a similar combination of factors as those considered by defendants’ experts. For example, the blood test results, predictive models for estimation of use times, and studies on the effects of marijuana during the determined time frames were used to find impairment. Additionally, the plaintiffs’ expert agreed that, even with a urine test, if “you know something about the individual’s history ..., if you know that they are infrequent or occasional users, there is a detection time when it is reasonable that individual used the drug.” The record also revealed that one of plaintiffs’ experts’ criticism was that the defendants’ experts’ conclusions did not reach the level of reliability required for the reporting of scientific laboratory and study results. However, it appears from the depositions that the requisite scientific |islevel is higher than the indicia of reliability required for expert testimony and opinion at trial.
Therefore, with the one exception discussed below, the trial court erred in granting the motion to exclude and motion for partial summary judgment. On summary judgment, the trial judge may not make credibility determinations. See La. C.C.P. art. 966; Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257, pp. 16-17 (La.2/29/2000), 755 So.2d 226, 286. Similarly, the inquiry under a Dau-bert/Foret review on summary judgment is based on undisputed material facts and “focus[es] ... solely on principles and methodology, not on the conclusions that they generate.” Daubert, 509 U.S. at 595, 113 S.Ct. at 2797; see Independent Fire Ins. Co., 99-2181, 99-2257 at pp. 17, 755 So.2d at 236 (Emphasis added.). “If a party submits expert opinion evidence in opposition to a motion for summary judgment that would be admissible under Dau-bert/Foret and the other applicable eviden-tiary rules, and is sufficient to allow a reasonable juror to conclude that the expert’s opinion on a material fact more likely than not is true, the trial judge should deny the motion and let the issue be decided at trial.” Independent Fire Ins. Co., 99-2181, 99-2257 at p. 17, 755 So.2d at 236.
The obvious exception to our finding of admissibility is the defendants’ expert’s attempted calculation of a specific quantity of marijuana in the driver’s system based on data from the qualitative GC/MS test data. In this case, the GC/MS test was done only as a qualitative test; a test done to confirm the presence of a controlled substance. It was never intended to serve as a quantitative test to determine a specific amount of material present in the tested sample. The plaintiffs’ experts attacked various shortcomings in the collection, measurement, and testing of the urine sample used in the GC/MS test. The importance of these breaks in procedure are magnified when past data from a qualitative source is used to quantify. Although some scientific basis for the actual formula used for 1 ucalculation was submitted, the trial court could have found that the data from the GC/MS was not gathered using the necessary procedural safeguards for quantitative testing. As a re- *799 suit, the data used for the calculation lacked the requisite indicia of reliability. Without a minimal level of reliability, the subsequently calculated quantification from the GC/MS data would have been more prejudicial than probative and fails to meet the requirements of Daubert/Foret. In summary, we find that the trial judge could have reasonably excluded the defendants’ attempted quantification, but committed legal error in excluding the other probative, admissible evidence in the form of defendants’ experts’ opinions on the issue of marijuana use and impairment. A trial judge may not decide what expert evidence the jury should hear based on its own credibility determinations and resulting resolution of the disagreements between the experts. Independent Fire Ins. Co., 99-2181, 99-2257 at pp. 16-17, 755 So.2d at 236.
The exclusion of admissible evidence may interdict a fair verdict. Thus, we must consider the effect of the erroneous exclusion of evidence on the jury verdict.
The resolution of legal cases may involve questions of fact and questions of law. Factual determinations are the sole province of the trier of fact, whether it be judge or jury. To preserve the right to a fair trial, the function of the entity that views the witnesses and hears the testimony first hand must be safeguarded. When the process of credibility determinations and fact finding operates correctly, the factual findings are reviewed by this court using the standard of manifest or clear error. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882-83 (La.1993). In other words, based on a presentation of admissible evidence, the jury may have made a factual finding different from one that would have been reached by this court, but the difference does not rise to a clearly erroneous finding upon the record. Thus, this court will not reverse based on those findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). However, if a |1Rtrial judge commits legal error by denying the jury relevant, admissible evidence, the fact finding process is interdicted, and thus, the verdict may be “tainted.” McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). “A legal error occurs when a trial'court applies incorrect legal principles of law and such errors are prejudicial.” Evans v. Lungrin, 97-0541, 97-0577, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735. For these reasons, evidence should not be withheld from the jury, unless it clearly meets the legal requirements of exclusion.
If the exclusion of evidence tainted a jury verdict, this court steps into the shoes of the factfinder and conducts a de novo review of all the admissible evidence to ensure a fair trial and a fair judgment that implements the jury’s verdict. McLean, 495 So.2d at 1304. However, a de novo review should not be undertaken for every evidentiary exclusion error. Unnecessary or added steps of review not only usurp the jury’s function, but are a clear waste of judicial economy. Therefore, a de novo review should be limited to consequential errors; that is, the error prejudiced or tainted the verdict rendered. See Evans, 97-0541, pp. 6-7, 708 So.2d at 735. In a few cases, this court believes that a preliminary de novo review can be limited to a determination of the impact of excluded evidence on the overall verdict. If it is clear from the initial limited de novo review that the excluded evidence could not have permissibly changed the final verdict (and thus did not taint the verdict), the jury’s verdict should not be vacated and reviewed de novo. In the absence of a tainted verdict, the verdict is subject only to a manifest error review. See Ruiz-Troche, 161 F.3d at 87. Such is the case before us on the *800 issue of the excluded evidence concerning the driver’s alleged use of marijuana, and its possible consequences.
Although we find that the majority of the proffered evidence was admissible, it is clear from our review of this record that the defendants failed in their burden to prove driver impairment at the time of the accident. Certainly, they failed to Improve that any alleged impairment caused this particular accident. Indeed, if the jury had made a finding of impairment based on the expert evidence on the impairment issue, it would have been manifest, clear error. The plaintiffs’ attacks on the lab procedures, the limits of the available test results, and on the analogies drawn and relied on by the defendants’ experts, were more than sufficient to defeat the defendants’ allegations of impairment and causation. Thus, in this case, the inclusion of the rejected evidence could not have permissibly changed the jury’s verdict. In the absence of a tainted verdict, a de novo review of the record to determine' “which party should prevail by a preponderance of the evidence” is not required. McLean, 495 So.2d at 1304. For these reasons, the portion of the jury verdict on allocation of fault will be reviewed using the manifest, clear error standard.

JURY INSTRUCTIONS

Defendants assigned error to the trial court’s failure (1) to give a jury charge on the statutory presumption provided by Louisiana Revised Statutes 32:235E, and (2) to further instruct the jury on the definition of the word “unreasonable.” Based on these errors, they request a de novo review. Plaintiffs assert that defendants did not request a charge on the statute or object to the court’s failure to further define “unreasonable.” Also, plaintiffs argue that the statutory presumption was rebutted, and the trial court fully informed the jury on the concept of unreasonable risks during the initial instructions. Therefore, the trial court properly exercised its discretion and no reversible error occurred. In its reply brief, DOTD noted the pages in the record where its objections to both errors appear.
Louisiana Revised Statutes 32:235E, provides, in pertinent part, that DOTD’s compliance with the “traffic control devices manual shall be prima facie evidence of discharge ... of its obligations to the motoring public.” At best, the |17prima facie evidence of compliance establishes a rebut-table presumption. See La. C.E. arts. 308 & 304.
The trial court instructs the jury on the law to be applied to the facts of the case. La. C.C.P. art. 1792. Whether to give an instruction is within the discretion of the court, and will not be disturbed absent an abuse of that discretion. Baxter v. Sonat Offshore Drilling, Inc., 98-1054, p. 6 (La.App. 1 Cir. 5/14/99), 734 So.2d 901, 906. If requested by the jury after it retires, the trial court “may give” further instruction. La. C.C.P. art. 1796A & B. On appeal, the adequacy of jury instructions must be determined in the light of the jury instructions as a whole. The discovery of an error in the instructions does not by itself justify a de novo review. The appellate court must measure the gravity or degree of error, while considering the instructions as a whole and the circumstances of the case. Lincecum v. Missouri Pacific Railroad Company, 452 So.2d 1182, 1190 (La.App. 1 Cir.), writ denied, 458 So.2d 476 (La.1984). A verdict should not be set aside unless the error in the instructions misled the jury to such an extent as to prevent it from doing justice. Baxter, 98-1054 at p. 6, 734 So.2d at 906.
*801 After a thorough review of the record, we find that the trial court erred in failing to give the requested jury instruction on the presumption offered by Louisiana Revised Statutes 32:285E. If the evidence supported a finding that the highway department standards, or MUTCD, were followed, DOTD was entitled to the presumption. Without knowledge of the presumption, the jury could not have known to apply it if the standards were found to have been met.
However, the measure of the error, in light of the circumstances of this record, does not require setting aside the jury’s verdict and a de novo review of the evidence on the issue of whether the highway presented an unreasonable risk of harm. The record contains disagreements between the various experts over (1) whether the MUTCD minimum standards on signage were met; and (2) whether |1Rthe minimum warnings were sufficient, under the peculiar facts concerning this area of 1-10. From the evidence before the jury, reasonable persons could have concluded that the MUTCD standards were not met, and that, if met, the traffic device standards were not sufficient under the particular circumstances here. Thus, no prejudicial error or injustice occurred, and we see no reversible error. Even assuming for the sake of argument a de novo review was required, the result would be the same. Based on the circumstances here, an earlier, functional warning was required.
On the request for an additional explanation of the meaning of “unreasonable,” we cannot say that the trial court abused its discretion. Initially, the court instructed the jury on the various applicable precepts, including an instruction on what factors may be used to determine unreasonableness. During deliberations, the jury requested an additional definition of “unreasonable.” The minute entry for February 20, 2001 states that the trial court “conferred with counsel for both sides, and there was no agreement as to the definition; therefore, none was given by the court.” Based on the information provided in the initial jury instructions, and the inability of the parties to agree on an additional explanation or definition, we see no abuse of the trial court’s discretion.

OBJECTIONS TO WITNESS TESTIMONY AND EVIDENCE

Gillen Testimony

On the day of the accident, Mr. Michael Gillen was a Baton Rouge police officer charged with investigating the accident. During his testimony, DOTD objected and argued that Mr. Gillen was giving expert opinion testimony without having been qualified as an expert. On appeal, defendants assigned error to the trial court’s failure to exclude the opinion testimony. Defendants also argued that Mr. Gillen, who worked for plaintiffs’ attorneys after leaving the police department, should not have been allowed to testify on the basis of prejudice.
_LlgLouisiana Code of Evidence article 701 allows a lay witness to provide opinion testimony if (1) “Nationally based on the perception of the witness; and (2)[h]elpful to a clear understanding of his testimony or the determination of a fact in issue.” Thus, Mr. Gillen, though not an accident reconstruction expert, could give opinion testimony based on his training, investigation, perception of the scene, and observation of physical evidence. See Whetstone v. Dixon, 616 So.2d 764, 768 (La.App. 1 Cir.1993), writ denied, 623 So.2d 1333 (La.1993) (rehearing granted on other grounds) (State trooper was allowed to testify on point of impact for accident.). Whether article 701 was violated or Mr. *802 Gillen was unduly prejudiced in favor of the plaintiffs was a determination within the discretion of the trial court. See State v. Catanese, 368 So.2d at 983; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544, 92-1545, p. 11 (La.App. 1 Cir. 3/11/94), 634 So.2d 466, 476-77, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
The majority of Mr. Gillen’s testimony related pertinent facts about the accident scene. For the most part, the portion of the testimony that could be seen as hybrid or opinion testimony met the requirements of Code of Evidence article 701. Where Mr. Gillen may have strayed into opinion beyond those codal parameters, his testimony was redundant to the testimony of plaintiffs’ qualified experts. As to the claim of prejudice, the fact of prior work relationships alone is not sufficient to support a claim of collusion or unduly prejudiced testimony. Attorneys and investigators often work together on projects and in opposition on others. More importantly, defendants’ questioning informed the jury of Mr. Gillen’s work connections to plaintiffs’ attorneys and that Mr. Gillen was no longer a police officer. For these reasons, we see no basis for reversible error.

Bronstad Testimony

Before trial, defendants filed a motion in limine to exclude the opinion of plaintiffs’ expert, Mr. Maurice Bronstad, on the structural character of the site of |gothe accident. At trial, the court accepted Mr. Bronstad as an expert for plaintiffs in the area of highway safety engineering. Mr. Bronstad testified that the accident occurred on “a ramp like structure” that is actually a continuation of I — 10 as opposed to defendants’ characterization of a ramp approach to 1-10.
In briefs to this court, defendants highlighted the record page where the testimony appears and argue that the trial court erred in denying the motion in limine. Specifically, defendants assert that Mr. Bronstad had no factual basis for his opinion and that the testimony did not meet the Daubert/Foret standards for reliability.
Based on our thorough review of the record, we see no abuse of the discretion afforded the trial court. See State v. Catanese, 368 So.2d at 983. The attack on the testimony is based on an opposing description or characterization given by defendants’ expert, rather than on a proven lack of scientific support or reliability.
Defendants also cited a specific portion of the trial transcript and assigned error to the trial court’s failure to disallow Mr. Bronstad’s irrelevant “hearsay” testimony concerning six prior accidents on the same roadway. Mr. Bronstad testified that, in preparation for trial, he reviewed six prior accident reports. Mr. Bronstad opined that the site of the accident was prone to tractor-trailer load shift problems and rollover. However, no hearsay or relevancy objection to the testimony appears of record at the pages placed at issue by defendants. During Mr. Bronstad’s testimony, the trial court refused to let photographs and reports of the accidents into evidence. Instead, the exhibits were proffered by plaintiffs. Subsequent to Mr. Bronstad’s testimony, defendants discussed the same six accidents with their expert, Mr. Neil Rowan.
In response to an appellee brief arguing the lack of an objection to the testimony at issue, DOTD replied that admissibility was argued during pre-trial |^motions. However, the only specific citation to a record page or exhibit is to an earlier general trial objection to any discussion of the six accidents. No basis for the general objection was given, no objection to the pre-trial *803 ruling was cited, and no reference to the pre-trial ruling was provided.
Evidentiary admissibility rulings are well within the discretion of the trial court. See State v. Catanese, 368 So.2d at 983; Belle Pass Terminal, Inc., 92-1544, 92-1545 at p. 11, 634 So.2d at 476-77. In the absence of a contemporaneous objection made with the grounds thereof, this court may refuse to consider the assigned error. See La. C.C.P. art. 1635; Bienvenu v. Dudley, 95-0547, p. 8 (La.App. 1 Cir. 10/3/96), 682 So.2d 281, 286, writs denied, 96-2661, 96-2673 (La.12/13/96), 692 So.2d 1069, 1070. This court may also refuse to consider an argument made without specific reference to the record volume and page containing the basis for the argument. Uniform Rules-Courts of Appeal, Rule 2-12.4.
Based on our thorough review of the record, including the failure to document sufficiently the specific grounds and ruling, and the defendants’ own offered testimony on the same accidents, we see no basis for a grant of defendants’ request for de novo review or reversible error. The complained of testimony was not contemporaneously objected to by defendants at the cited record page, the prior general objection did not state the grounds for the objection, no objection was cited to any pre-trial ruling on this matter, and the record as a whole does not support a finding that Mr. Bronstad’s testimony caused a prejudicial or reversible error. A reasonable jury could have found that the character of the accident site was prone to load shift and rollover problems based on testimony and evidence surrounding the one accident at issue.

|Jtebuttal Testimony

On rebuttal during the trial, plaintiffs offered Mr. Gillen and another expert, Mr. James Raymond Lock, an expert in accident reconstruction and highway design. Defendants assigned error to the trial court’s failure to disallow the rebuttal testimony by plaintiffs’ experts. Essentially, defendants argue that the testimony was redundant of their prior testimony and not valid rebuttal testimony.
Plaintiffs are entitled to rebut the evidence and testimony offered by defendants. La. C.C.P. art. 1632(3). Evidentiary admissibility rulings are well within the discretion of the trial court. State v. Catanese, 368 So.2d at 983; Belle Pass Terminal, Inc., 92-1544, 92-1545 at p. 11, 634 So.2d at 476-77.
Plaintiffs’ experts’ rebuttal testimony was generally in the same areas of their initial testimony, but was not unduly repetitious or prejudicial. The thrust of their testimony was to rebut the evidence and opinions offered by defendants, particularly defendants’ accident reconstructionist. In great part, the rebuttal testimony centered on defendants’ expert’s opinion on what physical evidence, found at the scene, actually related to the accident in question; a point on which the two sides disagreed. Thus, we see no abuse of discretion by the trial court.

Tickets

Defendants assigned error to the trial court’s exclusion of two traffic tickets that defendants offered as evidence. Allegedly, the tickets were issued to Mr. Clark, the driver of the truck involved in the accident. The tickets were not introduced, but were proffered. Although DOTD cites in its brief to a page in the record where the trial court ruled on admissibility, the record does not contain a specific ruling excluding the tickets.
The relevancy of evidence and the effect of prejudice from the offered evi *804 dence are governed by Louisiana Code of Evidence articles 401-103. These evidentiary admissibility rulings are well within the discretion of the trial court. State v. Catanese, 368 So.2d at 983; Belle Pass Terminal, Inc., 92-1544, 92-1545 at p. 11, 634 So.2d at 476-77. Assuming the trial court specifically ruled and excluded the tickets, our review of the record and the proffered tickets supports a ruling based on insufficient relevancy or a finding that the tickets were more prejudicial than probative. Certainly, we see no abuse of the trial court’s discretion. One ticket appears to be a speeding ticket; the other is not. Neither ticket has a discernable date, nor can the essential facts of the speeding ticket be gleaned from what is a poor copy at best.

DEFECT AND ALLOCATION OF FAULT

Both sides offered testimony and evidence on the plaintiffs’ allegations of an unreasonably dangerous roadway, defective by inadequate warnings and in design. Both sides presented contradictory reconstructions of how the accident occurred and its cause. In its verdict, the jury specifically found “a defect existed in 1-10 that created an unreasonable risk of harm,” the DOTD had notice of the defect, and that DOTD and the driver of the truck were at fault. The jury allocated 54% of the fault to DOTD and 46% to Mr. Clark.
Mrs. Wingfield, the co-plaintiffs in her suit, and defendants assigned error to the jury’s allocation of fault. Defendants also assigned error to the jury’s finding that DOTD was liable.
Whether a highway is unreasonably dangerous is a finding of fact reviewable under the standard of manifest error. That is, the trier of fact’s findings may be set aside only if found to be clearly or manifestly wrong. See Snearl v. Mercer, 1999-1738, 1999-1739, p. 10 (La.App. 1 Cir. 2/16/01), 780 So.2d 563, 573, writs denied, 2001-1319, 2001-1320 (La.6/22/01), 794 So.2d 800, 801. Allocation of fault is a factual finding within the discretion of the trier of fact. It also is reviewed under the manifest error standard. Snearl, 1999—1738, 1999-1739 at p. 25, 780 So.2d at 582.
| j^From the verdict, we do not know on what basis, whether design, signage, or both, the jury found that a defect existed. However, based on a thorough review of this record, the jury could have reasonably found as follows: (1) that a sharp lefthand curving continuation of I-10W, which necessitated an unusual 20 MPH drop in speed on an interstate, coupled with a seemingly straight flow for motorists exiting onto I — 110, created a hazardous driving condition; (2) that the sharpness of the curve and drop in speed would be particularly hazardous for a driver of a loaded, top heavy, double-decker cattle trailer, who was unfamiliar with the I-10W/I-110 split in Baton Rouge; (3) that prior to the actual split and entrance onto the curve, the driver’s attention had been engaged by signs directing the need for choice of lanes based on destination; (4) that some signs were dirty or filmy and that an electronic warning sign placed in advance of the curve was not working on the day of the accident; (5) that the first warning of a sharp curve and significant drop in speed came at the entrance to the curving ramp; (6) that these conditions created a defect that caused an unreasonable risk of harm on the day of the accident, (7) that DOTD had notice of the defect; and (8) that DOTD was negligent in not placing an earlier, static, permanent sharp curve and speed reduction warning in advance of the split and ramp entrance. The jury could also have found that an experienced commercial cattle truck driver should have been alerted and slowed fur *805 ther, or appropriately responded to the unusual hazard sooner than he did; decisions that may have ameliorated the severe consequences. Thus, from our review of this particular record, we cannot say that the jury’s verdict on liability was manifestly or clearly wrong. Additionally, if sitting as the fact finder, we may have allocated the fault differently, but we see no abuse of the jury’s great discretion in its assessment of fault.

IsREALLOCATION OF FAULT BY TRIAL COURT

In the judgment dated May 2001, which was later amended and adopted by the appealed judgment of August 2001, the trial court re-allocated Mr. Clark’s 46 percent of the fault to DOTD. The reallocation applied only to the Wingfield survival and wrongful death causes of actions and awards. The trial court’s decision was based on the status of Mr. Wingfield and Mr. Clark as co-employees, who cannot sue each other for recovery based in tort. See La. R.S. 23:1032. The trial court, based on the inability of co-employees to sue each other, found that defendants, as solidary obligors with Mr. Clark, were liable for the full 100 percent of the Wing-field survival and wrongful death claims. Defendants object to the reallocation.
At the time of the accident in 1994, Louisiana Civil Code article 2324B provided, in pertinent part, as follows: “liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages .... ” Additionally, the article provided that:
Except ... as otherwise provided by law, ... the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfea-sor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person’s ... degree of fault, or immunity by statute or otherwise.
La. C.C. art. 2324B.
The issue here is the applicability, to named joint tortfeasors Mr. Clark and DOTD, of the statutory cap for solidary liability provided by article 2324. However, in spite of the wording of the statute, this court has held that the presence in the suit of a co-employee joint tortfeasor, named or unnamed, brings the issue of any cap under the holding of Cavalier v. Cain’s Hydrostatic Testing, Inc., 94-1496 (La.6/30/95), 657 So.2d 975 (superseded by 1996 statute). Snearl, 1999-1738, 1999-1739 at pp. 28-31, 780 So.2d at 584-86. In Cavalier, the Louisiana Supreme Court held that Civil Code article 2324B did not apply to the quantification of statutorily immune non-party employers.[4] Focusing on Cavalier’s interpretation of article 2324B in light of Louisiana Revised Statutes 23:1032 immunity, the Snearl court *806 found that Cavalier’s jurisprudential exemption from the statutory cap of 50 percent must be extended to a named joint tortfeasor co-employee, as well as non-party employers. Without the protection of the statutory cap, all the fault attributable to a co-employee may be reallocated to the non-immune tortfeasor. Snearl, 1999-1738, 1999-1739 at p. 31, 780 So.2d at 586.
In this case, Mr. Clark and Mr. Wingfield were co-employees.[5] Thus, Mr. Wingfield’s estate and heirs may not sue Mr. Clark because of the statutory immunity granted to co-employees by Louisiana Revised Statutes 23:1032. Based on their immunity status, and the inapplicability of the article 2324B cap as found by Snearl, DOTD may not take advantage of the 50 percent statutory cap for solidary obligors. Without the protection of article 2324B, the full amount of Mr. Clark’s fault may be reallocated to DOTD. See Snearl, 1999-1738, 1999-1739 at p. 31, 780 So.2d at 586. With the reallocation of Mr. Clark’s 46 percent, DOTD becomes responsible for 100 percent of the fault and of the award for the survival |¡>7and wrongful death claims. Therefore, the reallocation of fault as set by the trial court is affirmed.

DAMAGES

Plaintiffs and defendants assigned error to one or more components of the award of damages. Specifically, defendants assert that the jury awards of $5,000,000.00 for Mr. Clark’s general damages, $500,000.00 for Mrs. Gordean Wingfield’s loss of consortium claim, and $1,000,000.00 to Mrs. Gordean Wingfield for the wrongful death of her husband, are excessive under Louisiana law. In their answer to the appeal, plaintiffs argue that the trial judge erred in granting defendants’ motion for judgment notwithstanding the verdict (JNOV). The trial court reduced the award to Mr. Wingfield’s wife and children for his Civil Code article 2315.1 survival action from $800,000.00 to $500,000.00.
The trier of fact has discretion in the assessment of damages. La. C.C. art. 2324.1. On appeal, consideration of the jury’s determination of damages is limited to a review for manifest error or abuse of discretion. In determining the amount of damages, the discretion vested in the trier of fact is “great.” Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, Maritime Overseas Corp. v. Youn, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Only after a determination of an abuse of discretion or manifest error is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, 623 So.2d at 1260. If the trier of fact awarded excessive damages, the reviewing court can “disturb the award ... only to the extent of ... lowering it ... to the highest ... point which is reasonably within the discretion afforded that court.” Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976).
I ?jjMr. Clark was not conscious at the scene, and never regained consciousness. However, the doctors at the hospital gave *807 him pain medication in response to signs that he was experiencing pain. As a result of the accident, Mr. Clark suffered a closed head injury, fractured ribs, numerous abrasions, trauma to the right forearm, a partially detached ear, collapsed lungs, liver laceration, and a fracture of the femur. From conflicting testimony, the jury could have reasonably found that Mr. Clark may live for another 25-30 years, and was in a permanent minimally responsive state, rather than a truly vegetative unresponsive state.
The jury awarded Mr. Clark $1,500,000.00 for past and future bodily injury and physical pain and suffering, $500,000.00 for permanent disability and disfigurement, $1,500,000.00 for past and future enjoyment of life, and $1,500,000.00 for past and future mental anguish and distress.
General damages by their nature are not susceptible of exact quantification. Duncan v. Kansas City Southern Railway Co., 2000-0066, p. 13 (La.10/30/00), 773 So.2d 670, 682. And although the jury’s discretion is great, on this particular record, we find (1) that the awards for bodily injury and for disability and disfigurement are somewhat duplica-tive, and (2) that the jury erred by awarding an excessive amount for past and future physical pain and suffering and past and future mental anguish and distress. The awards may have been sustainable for a catastrophically injured victim generally, or a victim fully aware of the drastic changes permanently affecting his life. However, the magnitude of the injuries suffered does not determine the awareness. The level of physical and mental suffering, for a minimally aware victim, is not the same for a fully cognizant victim. Having found that these awards are excessive, we reviewed the jurisprudence for guidance in setting the highest reasonable award based on the circumstances here. See Coco, 341 So.2d at 335. From our review of the record, in light of similar awards for serious injuries, we find the highest reasonable award l^for the combined categories of bodily injury, physical suffering, and mental suffering is $1,000,000.00, rather than the $3,000,000.00 awarded by the jury. Chamberlain v. State, Department of Transportation and Development, 91-1942R, p. 3 (La.App. 1 Cir. 3/11/94), 633 So.2d 871, 873 (an older case with award of $600,000.00 for past and future physical and mental suffering); compare with Snearl, 1999-1738, 1999-1739 at pp. 3 & 35-36, 780 So.2d at 569 & 589 (an award of $2,000,000.00 for past and future physical and mental suffering to a fully aware victim with catastrophic injuries) and Brown v. Glaxo, Inc. 99-1531, p. 11 (La.App. 1 Cir. 11/15/00), 790 So.2d 35, 43, writs denied, 2000-3457, 2001-0035 (La.2/09/01), 785 So.2d 827, 832 (Plaintiff in vegetative state received no award for physical and mental pain and suffering.). Therefore, we reduce the award for the combined categories of bodily injury and physical and mental suffering to $1,000,000.00. Thereby, the total general damages award is reduced from $5,000,000.00 to $3,000,000.00.
Mr. and Mrs. Wingfield had been married about 27 years at the time of his death; her third marriage and his second. Mr. Wingfield spent a lot of time on the road as a truck driver, but, by all accounts, they had a loving and close relationship. When he died, Mr. Wingfield was 60 years old. He had a worklife expectancy of 2.39 years. Based on her wrongful death claim under Louisiana Civil Code article 2315.2, Mrs. Wingfield was awarded $1,000,000.00 for the death of her husband and $70,000.00 for loss of support. The medical and funeral expenses were awarded separately.
*808 Wrongful death claims do “not arise until the victim dies and it compensates” the claimants for their own injuries suffered after the death of the victim. Taylor v. Giddens, 618 So.2d 834, 840 (La.1993). The elements of the award for wrongful death include loss of love, affection, companionship, support, and funeral expenses. Gibson v. State, Department of Transportation and Development, 95-1418, 95-1419, p. 14 (La.App. 1 Cir. 4/4/96), 674 So.2d 996, 1006, writs denied, 96-1862, 96-1895, 96-1902 (La.10/25/96), 681 So.2d 373, 374.
Funeral expenses were separately awarded and not challenged. To the extent that the loss of support element of the total wrongful death award was challenged, $70,000.00 is well within the discretion of the jury. From our review of the different expert opinions on the issue, we see no abuse.
As to the award of $1,000,000.00 for the other elements of the wrongful death claim, the award is excessive under the facts of this record. It is possible that the jury may have been affected by the severity of Mr. Wingfield’s injuries and tragic death before his wife and family arrived to comfort him. Such injuries and suffering are elements of the survival action. See La. C.C. art. 2315.2; Taylor, 618 So.2d at 840. If the jury considered such elements, it erred. However, regardless of the actual reasons for the unusually high death award, the jury abused its discretion by awarding $1,000,000.00. Considering all the relevant factors, the closeness of the relationship, Mr. Wingfield’s age, his time away from home, and the length of the marriage, in light of prior valid awards under similar circumstances, $500,000.00 is the highest reasonable award possible at the time of trial. See Gibson, 95-1418, 95-1419 at pp. 14-15, 674 So.2d at 1006 (Close relationship and difficulty of wife in recovering from the death of her spouse was considered in award of $350,000.00.); Rick v. State, Department of Transportation and Development, 93-1776, 93-1784 pp. 13-14 (La.1/14/94), 630 So.2d 1271, 1277 (Supreme court considered the fact that couple worked together everyday in family business as grounds for reinstating trier of fact’s award of $400,000.00.); Faucheaux v. Terrebonne Parish Consolidated Government, 625 So.2d 683, 685 (La.App. 1 Cir.1993) (Loving relationship and 27 year marriage were factors considered in affirming award of $300,000.00.)
131 Therefore, we affirm the loss of support component, but reduce the death award to $500,000.00, for a total wrongful death award of $570,000.00. We amend the judgment accordingly.
Generally, loss of consortium claims by parents are calculated based on loss of love and affection, loss of companionship, loss of material services and financial support, and loss of aid and assistance. Snearl, 1999-1738, 1999-1739 at p. 40, 780 So.2d at 591-92. Certainly Mrs. Wingfield had a loving relationship with her son, and due to his permanent status of minimal responsiveness, she lost the former level of companionship that they enjoyed. However, Mr. Clark had not lived with his mother for several years, and they had not enjoyed a long-term, daily relationship; nor did Mr. Clark provide significant assistance, material services, or financial support to his mother. For these reasons, we find that an award of $500,000.00 was excessive. The highest possible award for loss of consortium under the facts here is $200,000.00. See Snearl, 1999-1738, 1999-1739 at pp. 40-42, 780 So.2d at 591-93 ( and cases cited therein). Therefore, the judgment must be amended to reflect the reduction from $500,000.00 to $200,000.00 *809 for Mrs. Wingfield’s loss of consortium claim.
The standard of review for a JNOV on appeal is a two-part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by the reviewing court using the same criteria used by the trial judge to decide whether to grant the motion. Joseph v. Broussard Rice Mill, Inc., 2000-0628, p. 5 (La.10/30/00), 772 So.2d 94, 99. In other words, considering all the evidence in the light most favorable to the party opposing the motion for JNOV, do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not reach different conclusions? Smith v. Davill Petroleum Company, Inc., 97-1596, p. 4 (La.App. 1 Cir. 12/09/98), 744 So.2d 23, 27. “If the answer to that [ .^.question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.” Joseph, 00-0628 at p. 5, 772 So.2d at 99. If we determine that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Smith v. Davill Petroleum Co., Inc., 97-1596 at pp. 4-5, 744 So.2d at 27.
On plaintiffs’ claim that the JNOV was granted in error, we agree. Severity and duration of the pain and suffering are valid considerations in assessing pain and suffering. Fleniken v. Entergy Corporation, 2000-1824, 2000-1825, p. 29 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1194, writs denied, 2001-1268, 2001-1305, 2001-1317 (La.6/15/01), 793 So.2d 1250, 1253, 1254. From the dynamics of this accident, Mr. Wingfield suffered one complete amputation and one crushed leg, with partial amputation. He suffered severe chest injuries and other serious injuries such as several fractured ribs and massive bleeding throughout his body, including the brain and kidneys. He was conscious at the scene, where, amidst an horrific sight of truck and cattle parts and sound of injured cattle thrashing, he lay on the highway awaiting transport. Several times, Mr. Wingfield asked about Mr. Clark’s condition. The movement from the ground to the ambulance was extremely painful. At the hospital, Mr. Wingfield survived for approximately three hours. He was conscious for much of the time from the accident until his death. He repeatedly expressed concern about Mr. Clark, who was his stepson, and asked for his wife. Unfortunately, his wife and family were not able to reach the hospital and provide comfort before Mr. Wingfield succumbed to his injuries. Dr. Alfredo Suarez, who performed the autopsy, testified that the injuries were some of the | almost severe he had seen in his career, and he opined that Mr. Wingfield suffered “quite a bit” of pain.
Considering all the evidence in the light most favorable to the plaintiffs, the facts and inferences do not point so strongly and overwhelmingly in favor of defendants that reasonable persons could not have reached different conclusions on the amount of damages. Based on the traumatic accident, the particularly egregious injuries, the level of pain and suffering, and the time of survival for this particular victim, the jury awarded $800,000.00 for Mr. Wingfield’s survival action for pain and suffering. Although the amount awarded in 2001 by the jury may have been at the highest end of a reasonable range, we cannot say that reasonable persons, under the specific facts of this case, could not have *810 reached such a conclusion. See Strawder v. Zapata Haynie Corporation, 94-453, 94-454, pp. 3-5 (La.App. 3 Cir. 11/02/94), 649 So.2d 554, 558-59 (An award of $500,000.00 for pain and suffering, experienced after an explosion for a period of thirty minutes until death, was held not excessive.); Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 892 & 901-02 (5th Cir.1994), modified on other grounds, 22 F.3d 568 (5th Cir.1994), cert. dismissed sub nom., Sea Savage, Inc. v. Chevron U.S.A., Inc., 512 U.S. 1265, 115 S.Ct. 5, 129 L.Ed.2d 906 (1994), and cert. denied sub nom., 513 U.S. 994, 115 S.Ct. 498, 130 L.Ed.2d 408 (1994) (Award of $500,000.00 was given by circuit court for pain and suffering for accident in which mechanic fell overboard and clung to barnacle infested oil platform leg for twenty-five minutes before drowning.). Thus, we find that the trial court erred in granting the JNOV. For these reasons, we reverse the grant of the JNOV, and reinstate the jury verdict of $800,000.00.

\MREVERSIONARY MEDICAL TRUST FOR FUTURE MEDICAL EXPENSES

Mrs. Wingfield, and the co-plaintiffs in her suit (Wingfield plaintiffs), assigned error to the trial court’s creation of a rever-sionary trust for the jury’s award of $4,000,000.00 to Mr. Clark for his future medical expenses. The Wingfield plaintiffs argue that Louisiana Revised Statutes 13:5106 B (enacted after the date of the accident and filing of the suit) effected a substantive change in the amount of damages awarded, and thus could not be applied retroactively[6] to this case. Secondly, Louisiana Revised Statutes 13:5114B(4) (in effect at the time of the accident and the filing of the suit)[7] abrogated Mr. Clark’s and his heirs’ vested right in Mr. Clark’s award for future medical expenses. Therefore, Louisiana Revised Statutes 13:5114B(4) was unconstitutional. Alternatively, if the statute was not unconstitutional, the statute applied only to judge trials and not to the jury award at issue here.
Both statutes provide for the creation of a reversionary trust for future medical expenses. Upon the death of the injured person, any funds remaining would revert to the public entity that established the trust. La. R.S. 13:5106B(3)(b); 5114B(4) (pre-1996 version). Another section of Louisiana Revised Statutes 13:5114 provided that the trial court could select a structured payment plan for future economic damages awarded by the judge to an injured person. La. R.S. 13:5114D(l)(a). However, the provisions for the structured payment plan are different from those governing the reversionary trust.[8] Unlike 13Rthe reversionary clause triggered by the death of the injured person, the structured payment “plan shall not operate to relieve the public entity from liability for the future payments un *811 less and until all future payments have been made.” La. R.S. 13:5114D(l)(b). Even assuming the reference to judge-made awards applied to reversionary trusts, it is clear from the statutory scheme in effect at the time that the word “judge” referred to the trier of fact, and was not meant to provide a specific exemption to jury awards. At the time of the passage of section 5114, Louisiana Revised Statute 13:5105 provided that suits against the state could only be tried by a judge. The goal of the legislation was to protect the public fisc by providing for structured payment plans. Its intent was not to differentiate between awards made by a jury and those granted by a judge. La. R.S. 13:5114A.
Although we do not believe that section 510633(3) effects a substantive change, section 5106B(3) provides for reversionary trusts only in suits against political subdivisions of the state. La. R.S. 13:5106B(3)(a) & (b). In a suit against the state or a state agency, the future medical benefits must be paid from the Future Medical Care Fund. La. R.S. 13:5106B(3)(c). In written reasons, the trial court referenced both statutes, but may have incorrectly cited to section 5106 for the creation of a reversionary trust. For use by the state in the form of DOTD, section 5114 provided the discretionary authority for the trial court’s creation of a reversionary trust.
In written reasons filed in the record, the trial court opined that the trust does not limit the amount of damages due the victim, Mr. Clark, because, when the trust terminates, the victim’s need for medical expenses no longer exists.. We agree. As applied to this victim-plaintiff, the creation of a reversionary trust does not derogate a substantive or vested right in actual damages suffered or incurred by the victim. The state’s liability for tort damages is not waived; the state is still liable for all of the victim’s medical expenses. Neither does a reversionary trust for |3fimedical benefits set a ceiling on damages. All medical expenses will be paid, and thus, the actual damages incurred will not be reduced. For these reasons, the creation of a rever-sionary trust does not effect a substantive change. Based on the same analysis, section 5114B(4), as applied here, would not be an unconstitutional limitation of the state’s liability that was prohibited at the time of this pre-1996 accident and suit. See Chamberlain v. State, Department of Transportation and Development, 624 So.2d 874 (La.1993) (superseded by 1995 Constitutional Amendment).
A plaintiff must prove the need for future medical benefits or expenses. Duncan, 2000-0066 at p. 17, 773 So.2d at 685. However, because the award must be made at the time of the trial, but before the services and payments are actually needed or incurred, the trier of fact must make an award based on speculation, including the life expectancy of the victim. To allow such an award to be deemed a property right, regardless of the amount of medical expenses or “damages” actually incurred in the future, would be an abuse of the very system that allows speculative awards in an effort to help an injured victim. The goal of the reversionary trust is not to limit actual damages, meaning the expenses incurred or owed. The creation of the trust does not deprive the victim of medical treatment or care. The trust only terminates after the need for medical care and treatment ends. After death, no new expenses can be incurred; thus, no damages are due or owed to the victim.[9]
*812 The medical trust operates to the benefit of the victim and ensures that the necessary funds for care and treatment remain available during the time of need, 1S7the life of the victim. The trust provides protection to the victim for what is arguably the single most important item of damages for Mr. Clark. For example, the victim’s family may feel that their investment plans for the award are prudent and will ensure future needs, but if a mistake is made, the payment for future medical services may be endangered or lost completely. Additionally, the trust does not substantively affect or reduce any rights of the families. The families have no vested right in damages that never come into being. After the death of the victim, no new “damages” for medical care or treatment expenses can be incurred. Certainly the victim’s estate is responsible for the victim’s debts, the due and payable medical expenses incurred. However, once those debts are paid, no new expenses or “damages” due the victim can arise. After death, the funds in the trust, which had only the potential of becoming damages due the victim, do not become part of the estate. Instead, those funds revert to the state. To find otherwise, would be akin to holding that from the estate’s obligation to pay credit card debts, flows the heirs’ rights to inherit the unused personal credit line from the same card.[10]
While protecting the victim’s benefits, the trust also ensures the integrity and stability of public finances by preventing the use of public funds in payment of potential state liabilities that never accrue. If damages in the form of medical expenses are not and cannot be incurred by the intended recipient, the use of state funds can no longer be approved. For these reasons, we see no error in the trial court’s creation of a reversionary trust for the future medical expenses. Thus, we affirm the creation of the trust in favor of Mr. Clark.

J¡¡¡¡COSTS

In the judgment of May 25, 2001, the trial court assessed 66% of the taxable costs to DOTD. Plaintiffs argue that only Mr. Clark was found to have been at fault. Thus, the other plaintiffs are free of fault and should not have to share in the payment of any costs of court. The “court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” La. C.C.P. art.1920. From our review of this particular record, we see no abuse of the trial court’s discretion in its division of the costs between the parties. The trial court is in a much better position to decide how the costs in such a complex and actively contested case should be apportioned.
For the foregoing reasons, the JNOV is reversed, and the jury’s award of $800,000.00 for the Wingfield survival action is reinstated. The $500,000.00 loss of consortium award to Mrs. Wingfield is reduced to $200,000.00; the total Wingfield wrongful death award is reduced from *813 $1,070,000.00 to $570,000.00; and the award of general damages to Mr. Clark is reduced from $5,000,000.00 to $3,000,000.00. As amended, the remainder of the judgment is affirmed.
The plaintiffs in both consolidated cases shared issues and worked jointly on the appeal and their answers to the appeal. Thus, the costs of the appeal for both cases, $36,649.15, are assessed as one-half to plaintiffs and one-half to defendants-appellants.
REVERSED IN PART, AMENDED, AND AS AMENDED, AFFIRMED IN PART.
GAIDRY, J., agrees and assigns additional reasons.

. Other parties were cited as defendants, but on appeal, we have only named the defendant-appellants.

. Other matters argued at the hearing, and decided by a judgment dated January 10, 2001, are not listed as they are not at issue in this appeal.

. The Louisiana Supreme Court, in Cavalier v. Cain's Hydrostatic Testing, Inc,, 94-1496, pp. 9-11 (La.6/23/95), 657 So.2d 975, 982 & n. 8, acknowledged the protection of a statutory cap offered to all named joint tortfeasors by Louisiana Civil Code article 2324B, but was troubled by the inequitable result of the quantification of an unjoined employer’s fault. The court explained that, upon quantification of the absent employer’s fault, the employee-victim would suffer a reduction in the percentage of fault recoverable and a reduction from the priority of the employer’s statutory lien on the recoverable proceeds. After review of the language of the codal article, the supreme court held that the pre-1996 version of article 2324B did not require quantification of the fault of a non-party employer. If employer fault could not be quantified, the third party tortfeasor had no protection under the statutory cap. See Cavalier, 94-1496 at pp. 12-14, 657 So.2d at 983-84.

. Mr. Clark and Mr. Wingfield's status as co-employees was recognized by this court in Wingfield v. State, Department of Transportation and Development, 97-1567, 97-1568, pp. 6-7 (La.App. 1 Cir. 6/29/98), 716 So.2d 164, 166-167, writ denied, 98-2068 (La. 11/06/98), 728 So.2d 395. Unfortunately for DOTD, it was denied the right to seek contribution from Mr. Clark in that case, based on La. C.C. art. 2323, and denied the protection of art. 2324 in this case.

.See La. C.C. art. 6; La. R.S. 1:2. In the absence of the express intent of retroactivity required by Louisiana Revised Statutes 1:2, the reviewing court must then classify the statutory provision in question as substantive, procedural, or interpretive. Procedural and interpretive laws that do not create new rights or duties, or change existing ones, may be applied retroactively. Genusa v. Dominique, 97-0047, pp. 8-11 (La.App. 1 Cir. 2/20/98), 708 So.2d 784, 790-91.

. The version of Louisiana Revised Statutes 13:5114 at issue here is the statute in effect before its repeal by Acts 1996, 1st Ex.Sess., No. 63. The current version of section 5114 does not provide for reversionary trusts.

. Similarly, we are not convinced by the argument that the creation of reversionary trusts is limited by a cap provided for settlements or compromises governed by section 5114 C(l) &(2).

. Obviously, expenses incurred before death may be billed after death. Those bills would be payable, as would bills for services reasonably and necessarily contracted for on a *812 monthly or longer time basis, when reimbursement is not customarily paid after the death of the victim. It is the need by the victim at the time the services or treatment are incurred or contracted for that changes speculative, potential damages into actual expenses and therefore recoverable damages.

. Arguably, the obligation imposed on a tort-feasor to pay medical expenses is in general an obligation owed only to the victim; a personal obligation, and not heritable. The payment for medical services and "performance [of medical services] is for the exclusive benefit of the recipient of such services.” 1 Saul Litvinoff, Obligations § 4.13, at 62, in 5 Louisiana Civil Law Treatise (2001); see La. C.C. arts. 1765-66. However, that reasoning is unnecessary here.